Kathleen **BENNETT**, et al., Plaintiffs,

v.

**CENTRAL TELEPHONE COMPANY OF ILLINOIS**, et al., Defendants.

No. 79 C 5000.

United States District Court, N.D. Illinois, E.D.

Sept. 30, 1985.

Thomas R. Meites, Lynn Sara Frackman, Mary Rose Strubbe, Meites & Frackman, Chicago, Ill., James B. McCabe, Schaumburg, Ill., for plaintiffs.

Nina G. Stillman, Thomas G. Abram, Vedder, Price, Kaufman & Kammholz, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

MILTON I. SHADUR, District Judge.

Eight women initially sued Central Telephone Company of Illinois ("Centel") and

Local 336, International Brotherhood of Electrical Workers ("Union") individually and on behalf of a class of all current and former Centel female employees, alleging employment discrimination in violation of Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. §§ 2000e to 2000e–17. This Court's August 4, 1982 memorandum opinion and order certified a class "of all women employed by Centel on or after November 18, 1977 who have been denied the opportunity to obtain plant side positions or who have in any other way been directly affected by Centel's policy of maintaining a sexually segregated work force."

In April 1984 plaintiffs and Centel entered into a Stipulation and Settlement Agreement (the "Agreement") resolving the dispute in plaintiffs' favor. Plaintiffs also agreed to dismiss their claims against Union on final approval of the Agreement, provided Union cooperated in specified ways with implementation of the Agreement. After (1) notice to the class of the proposed settlement and (2) a July 1984 hearing to determine whether the settlement terms were fair, reasonable and adequate, this Court approved the Agreement and dismissed the action with prejudice. It retained jurisdiction only for (1) enforcement and implementation of the settlement and (2) resolution of issues in connection with any petition by plaintiffs for attorneys' fees and costs.

As "prevailing parties" in a Title VII action, plaintiffs have now invoked 42 U.S.C. § 2000e–5(k) ("Section 2000e–5(k)"), with its provision for the award of a reasonable attorneys' fee as part of costs. Their Supplemental Motion for Fees and Costs (the "Petition") seeks to recover against Centel $375,158.25 in attorneys' fees plus an appropriate enhancement,

$12,895 for paralegal work and $11,494.64 as reimbursement of expenses.[1] Reflecting the too-often-encountered fees-on-fees problem, plaintiffs have also filed a Second Supplemental Petition for Fees (the "Second Petition"), asking to recover $50,706 in attorneys' fees, $4,556.25 in paralegal work and $14,982.89 in expenses, all incurred in prosecution of the Petition. Centel has objected on a number of grounds to the reasonableness of plaintiffs' request in both the Petition and the Second Petition. This opinion will address those objections in the course of determining a reasonable fee award pursuant to Section 2000e–5(k).

### Petition

As *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983) teaches:[2]

> The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. This calculation provides an objective basis on which to make an initial estimate of the value of a lawyer's services.

Plaintiffs ask compensation for 2,942.7 hours expended over a period of some 6½ years (primarily by four lawyers). They apply hourly rates ranging from $170 downward to $95 to different components of that total, depending upon the seniority and expertise of the lawyer doing the work. In addition plaintiffs seek fees for 515.8 paralegal hours at an hourly rate of $25.

Centel does not argue the number of hours expended by plaintiffs' counsel was substantially unreasonable. This Court's independent examination likewise finds no basis for such a conclusion, particularly in

---

**1.** In light of the structure of Section 2000e–5(k), as is also true of 42 U.S.C. § 1988 ("Section 1988"), nothing flows from the fact that an out-of-pocket expense does not fit within the categories of "costs" taxable under 28 U.S.C. § 1920. Such expenses are consistently treated as recoverable as part of "attorneys' fees" in the broad sense. See *Dowdell v. City of Apopka*, 698 F.2d 1181, 1190 & n. 13 (11th Cir.1983), citing *Wheeler v. Durham City Board of Education*, 585

F.2d 618, 623–24 (4th Cir.1978). This Court therefore consistently speaks of "expenses," rather than using "costs" in a colloquial (and therefore inappropriate) sense, as the parties have done.

**2.** *Hensley* was decided under Section 1988, which is substantively identical to Section 2000e–5(k).

view of the time span of the litigation—April 1978 through November 1984—and its complexity. What Centel does challenge is the hourly rates sought by plaintiffs, as well as the inclusion of hours expended on matters (1) that in Centel's view are not properly part of this litigation and (2) as to which plaintiffs were not "prevailing parties." In addition Centel raises questions about plaintiffs' counsel's timekeeping measures and conventions. Though Centel identifies few instances in which the challenged timekeeping practices improperly inflated the number of attorney hours reported, it asks presumptive reductions in the fee allowance based upon the asserted impropriety of those practices. Each of Centel's objections will be considered in turn.

One important point should be addressed briefly before this opinion turns to the particulars. Because Centel has mounted a highly specific and detailed attack on the Petition, it has created—though not necessarily purposefully—a situation in which there is danger of losing sight of the forest for the trees. True enough, plaintiffs are seeking a large amount—just short of $400,000—in attorneys' fees and expenses. But that amount (even if allowed in full) would be reasonable in light of the results obtained in this class action. Centel ultimately agreed not only to a monetary settlement of $735,000 but also to specific alterations in its hiring and promotion policies, designed to eradicate the complained-of discrimination. Moreover Centel agreed to provide semi-annual reports to plaintiffs' counsel detailing its efforts to eliminate the practices that gave rise to that litigation. Plainly the requested fee award must be measured against not only the monetary award but also the wide-ranging equitable relief embodied in the settlement. In that context, the fee request could in no event be deemed unreasonable on the theory it is disproportionate to the results obtained by plaintiffs and their lawyers.

## 1. Recovery of Sobek Time

Centel first challenges plaintiffs' request for $28,257.50 in attorneys' fees (for 201.3

hours of attorney time) accrued by plaintiffs' counsel in *Judith Sobek v. Central Telephone Company of Illinois*, FEPC Charge No. 1978 CF 581, a proceeding before the then Illinois Fair Employment Practices Commission ("FEPC"). Sobek, an employee in Centel's Customer Services Department, charged Centel with sex discrimination evidenced by her being paid less than males doing the same work. Sobek later charged Centel with retaliation and constructive discharge, claiming she was effectively forced to quit her job as a result of having filed the FEPC sex discrimination charge. In April 1982 an FEPC administrative law judge issued a recommended order finding against Sobek on her sex discrimination claim, but leaving open her retaliation claim. Sobek ultimately settled the latter claim with Centel for $33,334, plus attorneys' fees of $16,666.

Centel makes two arguments for excluding all *Sobek* time from any fees award in the present case:

> 1. Its payment of $16,666 in fees in settlement of the retaliation charge also fully settled any fees claim for *Sobek* time.

> 2. *Sobek*, which involved a different charging party, was wholly distinct from this litigation.

Neither argument is persuasive.

▬ Centel's first contention rests on the rather peculiar premise that plaintiffs are somehow considered to have given up a claim Sobek herself was not even entitled to assert in the *Sobek* proceeding. Because Sobek prevailed before the FEPC only on her retaliation claim, she had a right to fees there solely on that claim. As Sobek's FEPC-filed Petition for Fees and Costs ("Sobek Petition") ¶ 2 put it:

> Under the [FEPC's] decision, only those hours spent on the successful retaliation claim and those within the motion for sanction are compensable. Not surprisingly petitioner's counsel did not maintain their time records on this basis, and therefore have to attempt to allocate

their time. This allocation is set out in the attached affidavit.

Ultimately the Sobek Petition was withdrawn and the fees matter was resolved as part of the settlement. But it is wholly unreasonable to characterize that settlement—as it affects plaintiffs—as encompassing more in terms of fees than did the Sobek Petition.[3] In short, the Sobek settlement alone does not bar recovery for time spent on *Sobek* matters other than the retaliation claim, so long as plaintiffs can establish such time is properly compensable in the context of the present litigation.[4]

Plaintiffs ground their claim for *Sobek* time fees on the holding in *New York Gaslight Club, Inc. v. Carey,* 447 U.S. 54, 71, 100 S.Ct. 2024, 2034, 64 L.Ed.2d 723 (1980):

> In sum, we conclude that [Section 2000e–5(k)] authorize[s] a federal-court action to recover an award of attorney's fees for work done by the prevailing complainant in state [administrative] proceedings to which the complainant was referred pursuant to the provisions of Title VII.

Centel argues *Gaslight* is inapplicable here because Sobek was neither a named plaintiff nor a member of the plaintiff class and because the *Sobek* sex discrimination claims did not implicate the plant side/office side dichotomy that formed the basis of the class certification. But as plaintiffs point out, the plant side/office side dichotomy formed the background of

Sobek's claims. Pl. Ex. A at 6–15. And of course Sobek, an employee wholly appropriate for inclusion in the plaintiff class, was foreclosed from that status only by the fact that the settlement of her retaliation claim was conditioned upon her release of all other claims against Centel. In sum, the logic (if not the letter) of the *Gaslight* holding extends to a case like this one.

But even apart from *Gaslight,* the disputed *Sobek* hours are compensable under the rationale of *Hensley,* 461 U.S. at 433, 103 S.Ct. at 1939. Just last term *Webb v. Board of Education of Dyer County,* —— U.S. ——, 105 S.Ct. 1923, 1928–29, 85 L.Ed.2d 233 (1985) observed that such preliminary lawyer services as "the drafting of the initial pleadings and the work associated with the development of the theory of the case" are compensable as time reasonably expended on the action or proceeding. *Webb,* 105 S.Ct. at 1929 declined to allow fees for five years of work expended in connection with administrative proceedings before filing an action under 42 U.S.C. § 1983 because:

> The petitioner made no suggestion below that any discrete portion of the work product from the administrative proceedings was work that was both useful and of a type ordinarily necessary to advance the civil rights litigation to the stage it reached before settlement.

**3.** Nor is that conclusion affected by the fact Sobek, as a condition of the settlement, released all her claims against Centel (presumably including any fees claim based on her sex discrimination claim). As the next sentence in the text reflects, it is not Sobek who seeks fees for the attorney hours in question, but rather the plaintiffs in this case. They of course are not bound by Sobek's release *if* (1) work done on her case was also, in effect, work done on theirs and (2) Centel is not held liable more than once for the same work. As the discussion in n. 4 makes clear, plaintiffs seek no such double recovery.

**4.** Centel also notes a difference in the number of hours attributed to the *Sobek* proceedings by the Sobek Petition (no hours listed in 1978 and 701 hours in 1979) and by the Petition (reporting 54.20 hours in 1978 and 736.20 hours in 1979). That 35.20 hour difference as to 1979 time is slight and doubtless reflects the fact the

Sobek Petition was based upon an estimate, not a comprehensive review and reconciliation of time records. It also bears noting plaintiffs have sought to assure their request for 1979 time is not inflated. Of the 736.20 hours expended on *Sobek* in 1979, plaintiffs seek compensation here for only 201.3 hours, a figure reflecting (1) the elimination of all hours potentially related to the retaliation claim and (2) a prophylactic reduction of the remaining 402.6 hours by 50%. That 50% reduction would appear fully to take account of the additional claim of Centel Mem. 44–46 that much of the effort expended by plaintiffs' counsel on *Sobek* was duplicative. Finally, because plaintiffs seek no recovery based on 1978 *Sobek* time, there is no need to dwell here on the disparity between the Petition and the Sobek Petition in that respect.

Here, by contrast, plaintiffs reflect the *Sobek* hours as spent developing the factual basis for this litigation. Sobek's claim and the investigation it launched led to the discovery of Centel's pattern of sex discrimination. Hence it served as the springboard for this action, and the *Sobek* work for which plaintiffs now seek compensation was directly useable in this case. Had the lawyer time devoted to documenting the factual background of Centel's discriminatory practices not been expended in connection with *Sobek*, that same time would have had to be spent in connection with the present action.

Under those circumstances, and given plaintiffs' particular care in limiting their *Sobek* time request (see n. 4), there is no legitimate reason to deny their petition in that respect. Plaintiffs are entitled to recover attorneys' fees for 201.3 *Sobek* hours, all of which were spent on matters necessary to plaintiffs' conduct of this lawsuit and not compensable under the *Sobek* settlement.

### 2. Reconsideration of Class Certification

After this Court's August 4, 1982 opinion ("Opinion I") certifying the plaintiff class, both Centel and plaintiffs filed motions to reconsider the class ruling. Centel sought a clarification of the class definition to exclude from the class all those asserting salaried claims. On the other hand, plaintiffs sought a redefinition of the class to include salaried employees claiming discrimination "because of lack of plant side experience or otherwise" (Opinion I at 5, quoting Pl. Ans. Mem. 5).

This Court's April 6, 1983 memorandum opinion and order ("Opinion II") rejected both positions. Opinion II at 5 stated:

> It cannot be said that discriminatory salaried employee compensation claims deriving from Centel's segregative (plant v. office) employment practices were "denied certification." ... [T]hose claims are simply possible ingredients in measuring the damages suffered by certain class members.

Opinion II at 8 turned down plaintiffs' effort to expand the class to include salaried claims not deriving in any way from the plant/office dichotomy, viewing that as a late attempt to amend the complaint.

Against that background, Centel now claims plaintiffs are entitled to no fees for work done in connection with their motion to reconsider Opinion I. Because plaintiffs did not prevail on that motion, Centel says they are not entitled to recover fees under the teaching of *Hensley*, 461 U.S. at 440, 103 S.Ct. at 1943:

> Where the plaintiff has failed to prevail on a claim that is distinct in all respects from his successful claims, the hours spent on the unsuccessful claim should be excluded in considering the amount of a reasonable fee.

Accordingly Centel seeks to exclude 332.3 hours of attorney time devoted to the unsuccessful motion.

That argument is valid in part. Much of the substantial time spent on the class clarification motion was attributable to plaintiffs having deferred briefing on the motion, thus permitting them to undertake discovery they said they needed to support the enlarged class. As Opinion II at n. 4 explained:

> Had the now-asserted [salaried] claims been on [plaintiffs'] agenda from the beginning (as they now imply), their *ongoing* discovery would have been directed to those issues as well, and a full-blown special discovery would have been unnecessary. In the same vein, the parties' October 22, 1982 joint submission preparatory to a Fed.R.Civ.P. ("Rule") 26(f) conference reflects the fact most discovery unrelated to the present class certification issue had already been completed.

That contemporary account of plaintiffs' position casts serious doubt on their present assertion that the extensive discovery undertaken in connection with the reconsideration motion would have been necessary to their case at trial, irrespective of the denial of their motion. Nor

has plaintiffs' briefing on the Petition explained in any specific way how the fruits of that discovery bore on the class claims. It thus seems clear the discovery in question was triggered by and directly applicable to plaintiffs' unsuccessful effort to expand the class. That renders the time separate and distinct in *Hensley* terms and properly excluded from any fees calculation. It of course follows that legal research, discussions and briefing devoted to plaintiffs' own clarification motion must be excluded as well.

■ But plaintiffs did prevail in part on the clarification motions, for Opinion II also reflects this Court denied Centel's effort to limit the class. All plaintiffs' time related to refuting Centel's arguments is plainly compensable under *Hensley*. This Court cannot however split out such time from plaintiffs' other work on the clarification motion. That responsibility must fall in the first instance on plaintiffs. Accordingly a final fees determination as to hours on the clarification motion is deferred, pending a recalculation of compensable time along the lines outlined in this section of this opinion.[5]

### 3. *Eskrich EEOC Charge*

■ For much the same reasons applicable to the clarification motion, hours expended on the EEOC charge by former Centel employee Patricia Eskrich ("Eskrich") must be excluded. As this Court noted in Opinion II at 9 n. 5 in denying plaintiffs' clarification motion:

> Similarly plaintiffs' R. Mem. 9 n. 7 for the first time cites an October 1983 EEOC charge by [Eskrich] as an illustration of Centel's discrimination against salaried women. Eskrich may very well have a good claim to assert in an action against Centel, but plaintiffs incorrectly assume they may at any time shoehorn into *this* action whatever claims they happen to discover.

As that ruling reflects, the Eskrich charge was part and parcel of the salaried claims plaintiffs sought to include in the class via their clarification motion. Eskrich time is therefore nonassessable against Centel.

### 4. *Fees Assertedly Allocable to Union*

Centel contends as much as one-quarter of any fee award to plaintiffs, or at a minimum 311.3 hours, should be taxed exclusively against Union. To that end Centel cites *Allen v. Terminal Transport Co.,* 486 F.Supp. 1195, 1202–03 (N.D.Ga.1980), *aff'd sub nom. United States v. Terminal Transport Co.,* 653 F.2d 1016 (5th Cir.), *cert. denied,* 455 U.S. 989, 102 S.Ct. 1613, 71 L.Ed.2d 849 (1981), a case involving a Title VII claim against both an employer and several unions. *Terminal Transport,* 486 F.Supp. at 1202 (footnote omitted), assessed a portion of plaintiff's fees exclusively against the unions because:

> [T]he unions apparently felt they had a real and significant interest in the outcome of the cases. They determined to protect this interest by assuming for themselves an active role. Hence, in the negotiations following entry of the consent decree the unions often carried the laboring oar, in some cases to the exclusion of Terminal. They participated fully in negotiations over the extent of the retroactive seniority for individual class members, and at hearings before the special master. Even in the proceedings to determine attorneys' fees they played an active part, often raising issues not mentioned by Terminal and briefing matters that have no bearing on the unions' liability for fees, such as the fee provision of the consent decree.

But that description does not fit Union here. From the beginning plaintiffs' primary focus was on Centel's discriminatory employment practices. Correspondingly the settlement afforded relief almost entirely against Centel, requiring Union only to cooperate in the amendment of its collec-

---

**5.** Although this Court feels somewhat like a voice crying in the wilderness, it again urges both litigants to essay an agreement in this area rather than generating still another fees-on-fees dispute. Even a somewhat arbitrary settlement figure would seem to serve the clients better than a further proliferation of time.

tive bargaining agreement with Centel and to make efforts to assure that women employed on the plant side as a result of the settlement would not be harassed. In contrast to *Terminal Transport,* Union's participation in this lawsuit did not substantially impede its resolution.

 Of course Union was not a purely nominal defendant, and some plaintiffs' lawyer time during the course of this litigation was undoubtedly directed to sorting out the extent of Union's involvement with Centel in the challenged discriminatory practices. By definition, though, such efforts were targeted against both defendants, giving rise to joint and several liability and not to exclusive Union liability. Nothing is implied here as to the possibility of Centel's seeking some partial contribution from Union, but there is surely no reason to embroil plaintiffs in that dispute and risk their further unproductive generation of fees on fees.

 Only one block of time can really be said to have been expended specifically against Union: lawyers' work in opposing Union's summary judgment motion, which was ultimately defeated as a result of Centel's efforts rather than plaintiffs'. Given Centel's determinative role on that motion, no reason appears to treat it as a matter exclusively between plaintiffs and Union. It was rather part and parcel of this litigation, implicating the interests of all parties. Again plaintiffs' perspective was one of joint and several liability, and their counsels' time will be allowed against Centel.[6]

### 4. Reimbursement for Reconstructed McCabe Time

 One of plaintiffs' lawyers, James McCabe ("McCabe"), ceased keeping contemporaneous time records in 1980 at a point when Thomas Meites ("Meites") and Lynn Sara Frackman ("Frackman") became principally responsible for the case. As McCabe Dep. 65 states:

> [S]ometime after June of '80, as I said, I became more limited in the case, went on

to other functions and just became negligent and didn't keep the time records. For purposes of the Petition McCabe therefore had to reconstruct some 250 hours of his time, based on a review of other counsel's time records and his own files. Centel argues such reconstructed time records may not form the basis of a fee award. In addition Centel challenges other portions of McCabe's time on three grounds:

1. McCabe's attendance at depositions and status hearings was duplicative.

2. Because McCabe's presence in Chicago was not strictly necessary after Meites and Frackman took over principal responsibility for the case in June 1980, he should not properly be reimbursed for travel time, and in any event not at his requested hourly rate of $125.

3. ·Time spent by McCabe in waiting and doing such things as photocopying (McCabe Dep. 163–64) should not be reimbursed at his requested hourly rate of $125.

*Vocca v. Playboy Hotel of Chicago, Inc.,* 686 F.2d 605, 607–08 (7th Cir.1982) (per curiam) states the preferred standard for record-keeping:

> Finally, this court has recognized that a district court, in the exercise of discretion, may properly deny attorney's fees entirely. In *Brown v. Stackler,* 612 F.2d 1057, 1059 (7th Cir.1980), we held that "[s]uch denial is an entirely appropriate, and hopefully effective, means of encouraging counsel to maintain adequate records and submit reasonable, carefully calculated, and conscientiously measured claims when seeking statutory counsel fees."

> \*　　\*　　\*　　\*　　\*　　\*

> We made clear in *Brown v. Stackler, supra,* that counsel seeking statutory attorney's fees has a duty to maintain accurate and detailed time records. It is not enough to offer a rough estimate of the time expended and then explain dis-

---

**6.** Once more no view is expressed as to Centel's

possible rights vis-a-vis Union.

crepancies that arise with claims that were offset in other places.

There can be no doubt that maintenance of contemporaneously recorded time sheets is the better practice. See *Webb*, 105 S.Ct. at 1926 n. 6. On the other hand, courts have on occasion awarded fees based upon reconstructions, and *Webb* itself affirmed such an award just last Term. Moreover McCabe's reconstruction does not partake of the deficiencies identified in *Brown*. It was the product not of casual effort, but of a careful review of the documentary record and the contemporaneously-maintained time records of McCabe's co-counsel. That is reflected in the detailed nature of the reconstructed time records, specifying in most instances the nature of the work done.

 Nevertheless McCabe himself admitted (McCabe Dep. 177) the reconstruction may well contain errors attributable to faulty memory and improper estimates. Because McCabe is to blame for any such errors, he should bear the risk of their presence. This Court in its discretion will reduce by 20% the total number of hours for which McCabe seeks compensation after June 30, 1980, when Meites and Frackman assumed principal responsibility for the litigation.[7] Such a cutback, plainly on the high side, also corrects for any other Centel complaints—any duplication of effort and any undue charges for time unnecessarily spent on travel or such nonsubstantive matters as photocopying and waiting.

### 5. Use of Conventions

In preparing the Petition, plaintiffs developed and applied a series of nine "conventions" designed to make more rational the task of organizing time records maintained over the course of six years. Only conventions 3 and 5 could operate to increase plaintiffs' fees request:

3. Where meeting/conference listed by one person names another, entry for other meeting/conference attendee is added if time is clearly for the meeting and does not include other work. If time cannot be determined, entry not added.[8]

5. Where phone call listed by one person to another who did list the call, appropriate time (usually .10 hours) is added for non-listing attorney. If both listed, but time entry differed, used lower time.

Other conventions reduced the time allotted to telephone calls (all calls of less than .30 hours were treated as .10 hours, and all calls of .30 to .50 hours were treated as .30 hours) and adopted the lower figure when two attorneys working on the same matter recorded different periods of time.

 Centel objects to use of the conventions as dilutions of plaintiffs' duty to maintain adequate and contemporaneous time records. Centel also asserts the conventions mask inconsistencies and discrepancies in the reporting of time, which in some instances have been resolved against the fee petitioner by excluding the time altogether. But of course as a matter of logic, plaintiffs' treatment makes perfect sense, so long as there is no reason to doubt the accuracy of the records forming the basis of the reconstruction. This Court's examination of the time records in the case—both the compilation and the un-

---

7. That substantial reduction (necessarily arbitrary to some degree) has sought to err in Centel's favor. But any larger reduction would be inappropriate, for McCabe continued to have an active role in the litigation even after Meites and Frackman assumed principal responsibility for the litigation. As Pl.R. Mem. 37–38 points out, McCabe (who lived and practiced in the suburban area where most of the class members lived) had the important job of maintaining communications with the class members and conveying their concerns to Meites and Frackman in Chicago.

8. Convention 3 must be read in connection with convention 6:

(6) If one attorney shows a short conference with another attorney who shows only a larger block of time that does not include the conference on the subject, "conf w/— on —" is inserted in the nonlisting attorney's description, but no time is added to that attorney's hours.

derlying contemporaneous records—reveals nothing to indicate an abusive use of the conventions. This Court's task is to determine a *reasonable* fee. Reasonableness is as much a matter of assuring an adequate fee as it is of eschewing an excessive one. Where as here there is adequate record support indicating the conferences and telephone calls to which the conventions applied actually occurred, it would be unduly punitive to deny plaintiffs' counsel their fees, especially by cutting the ultimate fee award by a flat 10% as Centel proposes.[9]

### 6. Paralegal Hours

Though Centel has not objected to plaintiffs' entire claim for an award based on 515.8 paralegal hours, it does charge plaintiffs have (1) redesignated paralegal time actually devoted to photocopying and delivery (and therefore properly to be omitted under plaintiffs' own convention 9) as though that time had been spent "processing" claim applications and then (2) included the time in their summary. One of the difficulties with the "paralegal" label is that it may be used to cover services ranging downward from work that would normally occupy lawyers and is thus more economically done (here the hourly rate charged is $25) by a person with significant training, though not a law degree, to work that is of a purely clerical or messenger nature. As to the latter kind of activity,

this Court explained in *Roe v. City of Chicago*, 586 F.Supp. 513, 516 (N.D.Ill.1984) (emphasis in original) that though lawyers may bill their clients for such "paralegal" time:

> [T]his Court (having approved the lawyers' hourly rates as reasonable in specific contemplation of the fact such rates *include* an overhead factor covering among other elements the time and work of non-lawyer personnel) will not unfairly impose the same burden on the adversary who has not bargained for such treatment. . . .

In this instance plaintiffs have really not dealt with Centel's objection to their "paralegal" application in these terms (though to be fair, Centel has not posed its challenge just that way either). This Court must defer ruling on the disputed amount pending further information.

### 7. Clerical Errors

 On the whole it is clear plaintiffs have devoted substantial care to preparation of their time summary. Nonetheless Centel has identified three spots in which time is listed twice. One 4.5 hour block of Frackman time (on January 20, 1980) and one 2.8 block of Strubbe time (on August 30, 1984) were listed twice. In addition 7 hours of Frackman time were mistakenly recorded on both February 9 and February

---

**9.** Indeed there is something quite offensive in Centel's approach to this issue. We are of course far removed from the early 19th century "gentleman ideal" of legal fees as gratuities, for payment of which a lawyer could not bring suit. 2 *Papers of Daniel Webster: Legal Papers* 120–21 (A. Konefsky & A. King, eds. 1983). But lawyers continue to vary widely in their methods and precision of recordkeeping. Most lawyers do not keep their time records chained to their wrists like the diplomatic courier's attache case, recording every time expenditure on a contemporaneous basis. Many perfectly sound and highly skilled lawyers are less than methodical in their own timekeeping habits—and many (including, it may be safely wagered sight unseen, partners and associates in the law firm representing Centel) make their time entries at the end of a day, or even one or more days later. And of course anyone who has been active in the legal community for any period of time

knows of lawyers (or even law firms) notorious for employing "conventions"—used here in the euphemistic sense—that invariably cut against the client and in favor of maximizing billing. Let us however leave such questionable practices aside. As the senior active partner in a law firm, with primary responsibility for a great deal of client billing, this Court regularly had to reconcile a good deal of apparent surface inconsistency created by nothing more than the fact that other partners and associates were somewhat less compulsive (and hence less meticulous) about time records, though essentially contemporaneous and accurate. In railing against plaintiffs' quite reasonable "conventions" and urging a wholly arbitrary discount, counsel for Centel urge a position that is not only unwarranted but whose application to their own law firm (in accordance with Kant's categorical imperative) would doubtless horrify them.

10, 1980. Those duplications, of course, are disallowed.[10]

### 8. Reasonableness of Hourly Rates

Five lawyers represented plaintiffs at one time or another over the course of this litigation: Meites, Frackman, McCabe, Michael Mulder ("Mulder") (for a very small number of hours) and Mary Rose Strubbe ("Strubbe"). Plaintiffs ask the following rates for their time:

| | |
|---|---|
| Meites | $170 |
| Frackman | $135 |
| McCabe | $125 |
| Mulder | $110 |
| Strubbe | $ 95 |

Centel objects to those rates as unduly high, pointing to recent cases involving awards of hourly rates ranging from $75 to $150. Centel proposes an award on the Petition at rates ranging from $75 to $130, noting those rates more nearly match those charged by its own attorneys.

 Current (not historical) market value is the standard for appraising the requested hourly rates. *Coleman v. Frierson*, 607 F.Supp. 1578, 1580–81 (N.D.Ill. 1985). That standard has been met here:

1. Meites, a 1969 law school graduate with extraordinarily distinguished cre-

dentials, has specialized in complex class action litigation in the securities, antitrust and employment discrimination fields. In recent years he has published a number of articles on employment discrimination and class action litigation. In support of the Petition he has submitted an affidavit and recent billings indicating his current noncontingent hourly rate is $165. Increasing that rate minimally to $170 is reasonable, especially given the contingent nature of this litigation.[11]

2. Frackman, a 1973 law school graduate, has been Meites' partner since 1980, concentrating her practice on federal class litigation. Before that she had done Title VII and general litigation and had served as an Assistant Illinois State Appellate Defender. Though she has submitted no recent billings in support of her requested rate, Meites' affidavit asserts he would bill her time on an hourly noncontingent matter at $130 to $135 per hour. This Court's own knowledge of market rates applicable to a well-qualified lawyer with 12 years' experience confirms the reasonableness of time charges in that range.[12]

3. Michael Mulder, a 1975 law school graduate, joined the Meites firm in 1982 and has concentrated on federal class

---

**10.** In a sense that disallowance, minimal in comparative terms yet aggregating nearly $2,000, highlights the insoluble problem posed by fee petitions. In all likelihood the amount of lawyers' time (and hence client's money) spent in uncovering such errors must have exceeded the amount saved. In purely cost-efficient terms the game has not proved worth the candle. Yet the alternative of letting the claim go unscrutinized is even less satisfactory. No one has suggested a reasonable resolution of the dilemma.

**11.** Only last week Judge Leighton of this District Court awarded fees in another complicated employment discrimination action, *EEOC v. Burlington Northern, Inc.*, 618 F.Supp. 1046, 1055 (N.D.Ill.1985). Hourly rates approved there ranged from $180 for the most experienced partner to $95 for the least experienced associate, essentially paralleling the rates requested by plaintiffs here. Indeed the hourly rate approved there for George Galland, Esq. (whom both parties in their memoranda in this case likened to Mr. Meites) and his contemporary partners was

the identical $170 figure approved here for Mr. Meites.

**12.** Judicial awards in the fee area too often draw on the judges' undisclosed sense (usually informed by outdated experience) of market values rather than evidence. But such resort to a kind of judicial notice can be justified (if at all) only in such areas as Fed.R.Civ.P. 37(a)(4) fee awards or the like, where a full-blown evidentiary inquiry would be uneconomic. In the present situation, with more money at stake than most lawsuits involve on the merits, it would be improper to treat the reasonableness of hourly rates differently from any other issue of fact, to be proved by competent evidence. Here plaintiffs have in fact tendered such evidence, adequate in itself to support approval of the requested rates. But where (as in one or two instances) the technically adequate evidence has taken the form of a self-declaration rather than actual billing verified in the crucible of the market, this Court has no reluctance to confirm the validity of the proffered figures.

litigation since that time. Soon after he joined the firm, his time was billed at an hourly rate of $110, as reflected in statements submitted in support of the Petition. Meites Aff. ¶ 8 indicates Mulder's current noncontingent rate is between $120 and $125 per hour. Both the earlier and the current rates are reasonable.

4. Strubbe joined the Meites firm on her graduation from law school in 1981. Apart from participating in the firm's extensive federal class action practice, she has co-authored with Meites an article entitled "Practice and Procedure in Employment Discrimination Litigation, Including Class Action Principles." Strubbe has submitted recent correspondence indicating her current noncontingent hourly rate as a fourth-year associate with the firm is $95. That too is a reasonable rate here.

5. McCabe, a 1975 law school graduate who referred this case to the Meites firm, is a sole practitioner with a general practice concentrated in employee relations consulting and litigation. Though he has had little litigation experience, and particularly not in complex class litigation, before attending law school he had several years of experience in industry in employee relations and industrial management. He acted as the primary liaison with the class members. Though McCabe has submitted no recent billings indicating his consulting or law practice charges, an hourly rate of $125 seems a reasonable reflection of the combination of knowledge and skills deriving from his past experience.

Plaintiffs' requested fees may perhaps be at the upper end of, but they certainly do not exceed, the market range. By chance this Court now has under consideration a recently-filed fee petition in a commercial case, reflecting hourly rates for lawyers in another highly-respected Chicago law firm. Those rates range (1) from $150 to $165 for partners (a) with less experience and lesser credentials than Meites and (b) with less seniority than Frackman, and (2) from $70 to $108 for associates. This Court's knowledge of the billing rates for the several lawyers' counterparts in this Court's former law firm also confirms the conclusion it had already reached based on the evidence in this case (see n. 12). And of course the prosecution of a complicated Title VII class action requires the same degree of skill and specialization as does a complicated commercial case. With or without taking into account the contingent nature of counsel's fees in this case, plaintiffs' request for hourly rates in the upper part of the market range is reasonable.

Centel's counsel's argument based on their own hourly rates is a non sequitur in a number of respects. But because their contention is pressed so earnestly, it is worth a brief comment. Even apart from the fact the rates they disclose appear to be materially below rates charged by other firms (an option available to any law firm for competitive purposes or otherwise, but not one they can force on Section 1983 plaintiffs who have shown the higher market rates), Centel's counsel miss a fundamental difference between the ordinary billing by law firms to their established corporate clients and the fee determination in an opinion such as this one. No adversary process is at work when (say) Vedder Price bills its clients: No opponent culls through the time records with a fine-tooth comb to check for duplicative efforts, or to discount (for example) for the likelihood a young associate does not generate enough truly productive time so that a reasonable cost is represented by his or her time (even at the lower hourly rate charged for his or her services), or to carve out blocks of time or make any other adjustments as has been done here. Nor does a court scrutinize the firm's bills. What goes into the time-record computer goes out on the bills to the clients, presumably for prompt payment. It must not be forgotten that overall reasonableness is a function of reasonable hours times reasonable rates—and if there

is no parallel check on the former, there is no validity in a comparison of the latter.[13]

### 9. Multiplier

■ Not content with an award at the lodestar (hours × rate) figure, plaintiffs request enhancement of that amount as compensation for their efficiency in the conduct of this case and for the risks involved in this kind of contingent civil rights litigation. There has been a good deal of debate recently about the general validity of the lodestar approach, which often creates a disincentive for the efficient and expeditious handling of litigation. Valid though that criticism may be in many situations, it does not fit the circumstances here. As a starting point, then, the lodestar concept represents a sound methodology for determining a reasonable fee in this case.

That being so, plaintiffs' prayer for a multiplier runs afoul of the teaching of *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 1549, 79 L.Ed.2d 891 (1984) (footnote omitted):

> Because acknowledgement of the "results obtained" generally will be subsumed within other factors used to calculate a reasonable fee, it normally should not provide an independent basis for increasing the fee award.

To the extent "efficiency" is meant to denote settling the case rather than going to trial (and thereby saving time and expense), that is part of the concept of "results obtained" in the *Blum* sense. And to the extent "efficiency" is simply a synonym for one lawyer's doing the work while consuming less time than another lawyer might, that represents a product of plaintiffs' counsel's skill and experience with this kind of litigation—a factor accounted for in appraising the requested hourly rates in the preceding section of this opinion.

*Blum* did not address the question whether risk—particularly the risk of no recovery at all in cases taken on a contingency basis—justifies an enhancement of the lodestar amount. See *Wildman v. Lerner Stores Corp.*, 771 F.2d 605, 610 (1st Cir.1985). Courts of appeals have reached different post-*Blum* conclusions in that regard. See *Wildman, id.* at 611. Most recently our own Court of Appeals has said (*McKinnon*, 750 F.2d at 1392, quoting *Bonner v. Coughlin*, 657 F.2d 931, 936 (7th Cir.1981) (per curiam)):

> In this circuit, the risk of losing "alone does not justify the use of a multiplier."

■ This Court has considerable doubt as to the rationale underlying that conclusion, see *Wildman*, 771 F.2d at 612–14. Nonetheless it is bound by the *McKinnon* analysis, however doubtful. Moreover the relatively high hourly rates allowed plaintiffs' counsel in this case (both in absolute terms and when measured against the substantially lower rates charged by Centel's counsel) make up—at least in part—for the failure to allow any added compensation for risk. Finally, plaintiffs' conclusory statements about efficiency and risk are insufficient in evidentiary terms to establish the need for enhancement to make the fee award fully compensatory. Plaintiffs' request for a multiplier is denied.

### Second Petition

Centel objects to the Second Petition on three grounds. First, of course, it renews its challenge to reasonableness of the hourly rates sought by plaintiffs. Second, it identifies a number of charges as duplicative or excessive. Third, it questions the

---

**13.** Nothing here should be understood as particularly critical of the firm representing Centel (Vedder, Price, Kaufman & Kammholz, reported in the National Law Journal's Sept. 30, 1985 listing of the country's 250 largest law firms as in a three-way tie for 180th place, with 113 lawyers [73 partners and 40 associates] and 8 paralegals). It is simply that large-firm practitioners (especially not at the managing-partner level) may not have a full perception of real-world risks that impact on billing and collecting fees for most of the profession, and hence on reasonable hourly rates. It is interesting to contrast the exposition of risk factors on market legal rates contained in Judge (then Professor) Easterbrook's affidavit, submitted in *Burlington Northern* (see n. 11), with the discussion of risk factors in the multiplier context by Judge Posner in *McKinnon v. City of Berwyn*, 750 F.2d 1383, 1392–93 (7th Cir.1984).

reasonableness of plaintiffs' tally of expenses.

### 1. Reasonableness of Hourly Rates

■■■ To the extent plaintiffs ask the same rates on the Second Petition as on the Petition, little further discussion is necessary. Two departures from those rates appear—and those, too, need only brief treatment:

> 1. Mulder's time is charged at $125 rather than $110 per hour (likely reflecting Mulder's having become a name partner of Meites and Frackman).
>
> 2. New Meites associate Lei Ann Marshall-Cohen ("Marshall-Cohen") participated in work on the petition. Her time has been charged at $95 per hour.

First, in objecting again to plaintiffs' requested rates, Centel calls attention to the billing rate of Paul Freehling ("Freehling"), an experienced attorney retained to represent plaintiffs' lawyers in connection with Centel's discovery related to the Petition. Freehling initially charged his time at a $145 hourly rate (increased to $150 as of July 1, 1985). But as plaintiffs point out, Freehling's rate is predicated on (1) a preexisting lawyer-client relationship of considerable duration, (2) a non-contingent fee arrangement and (3) payment of fees on a current basis. Nothing in the Freehling situation calls for reexamination of this Court's earlier conclusion.[14] As for the two new variants:

> 1. On the current-market approach taken by the cases (to compensate for the loss-of-opportunity costs and inflation), this Court might well recalculate Mulder's small amount of time in the Petition at the higher rate (see Coleman, 607 F.Supp. at 1581). It will not do so, but it will not reject Mulder's current rate for the Second Petition either.

**14.** See the text discussion preceding n. 13.

**15.** Centel has criticized the 222.25 hours of paralegal time, mostly spent in compiling and redacting the lawyers' time records. But in terms of the dichotomy as to paralegal time discussed earlier in this opinion, the $5,500-odd in fees (at the requested $25 hourly rate) appear to relate

> 2. No information has been provided as to Marshall-Cohen's background and experience (as was done for all the other lawyers). This Court has no way to evaluate the reasonableness of the $95 hourly rate.

### 2. Assertedly Duplicative and Excessive Requests

Most of Centel's opposition to the Second Petition focuses on its contention that a number of the time charges are unreasonable because duplicative or simply excessive. Its objections will be reviewed seriatim.

■■■ First, Centel claims the hours spent by plaintiffs' counsel in gathering time records for purposes of the Petition and for purposes of complying with discovery on the fees issue were inordinate, reflecting deficiencies in counsel's timekeeping procedures that should not be taxed to Centel. Centel also notes plaintiffs delayed the process by contesting Centel's discovery request and necessitating three separate motions to compel. But plaintiffs do not seek compensation for their lawyers' work in connection with the motions to compel. Nor does McCabe ask fees for the substantial time he spent in reconstructing his time records. In other respects, too, plaintiffs do not appear to have spent an inordinate amount of time in compiling and reviewing the large volume of time records covering six years of litigation. Indeed plaintiffs' overall performance (e.g., the compilation of Sobek time and the adoption of reasonable "conventions") reflects efforts designed to assure a fair taxation of hours against Centel.[15]

■■ Second, Centel challenges 109.45 attorney hours spent in preparing plaintiffs' reply memorandum in support of the Petition. There is always a significant

to lawyer-type rather than clerical services. And at the lowest lawyer's hourly rate of $95 requested in this case, just 60 hours would add up to a larger charge against Centel than the paralegal figure represents. No disallowance of the paralegal charge is called for.

component of second-guessing involved in trying to put oneself into another's shoes after the fact and to declare with certainty how much effort a given work product required. Here the reply memorandum was over 40 pages long, filed in response to a highly detailed 50-page memorandum submitted by Centel—a memorandum accompanied by a thick set of exhibits. Under the circumstances this Court cannot reasonably characterize as unreasonable the time spent in preparing the reply memorandum.

■ Third, the Second Petition indicates plaintiffs' counsel spent 15.35 hours reading and abstracting four depositions. That average of 4 hours per transcript seems altogether reasonable.

■ Finally, Centel mounts the peculiar argument that plaintiffs' counsel should not be entitled to recover for their time as well as Freehling's. As Centel Mem. 12 puts it:

> [T]o the extent the petitioners were acting as clients, they should not be permitted to double dip by charging for their attorney's, i.e., Freehling's, time as well as their own when they were functioning as clients and not as counsel.

But of course even when acting as clients, plaintiffs' counsel were working in support of the fees petition by complying with Centel's legitimate discovery requests. During that time they were disabled from working on other matters (a classic case of lost opportunity costs), nor could they fairly be expected to represent themselves. Their request for fees on their time as well as Freehling's is also reasonable.

### 3. Expenses

■ Centel claims plaintiffs' requests for expenses in connection with photocopying, deposition transcripts and Lexis research are excessive. Centel's objection to the photocopying charges lacks merit. It simply reflects Centel's miscalculation of the copying necessary to the process of redacting contemporaneous time records. As for the challenged transcript cost—a de minimis $22.50—it relates to a hearing be-

fore this Court, but the subject of that hearing is unclear. Given the possibility it dealt with plaintiffs' recalcitrance on a discovery matter, the sum will be disallowed.

■ Lastly, the Lexis research charge of $570.84 will be allowed. Computer-assisted legal research is becoming more and more common in the practice. Lawyer time expended on traditional research would unquestionably be taxable in the context of a fee award, and one of the principal sales points for Lexis and like services is that payment for the services, plus the lawyer time involved, costs the client less than the lawyer's time in corresponding traditional research would. There is no reason why the lower cost of a database search should not be taxable.

### Conclusion

As to the Petition, plaintiffs may recover fees at the requested hourly rates for the hours reported less (1) time devoted to the unsuccessful clarification motion, (2) the Eskrich time, (3) 20% of McCabe's time expended after June 30, 1980 and (4) the few twice-listed items. This Court cannot yet tell whether any paralegal hours should be disallowed. Expenses will be reimbursed in the requested amount.

As to the Second Petition, plaintiffs may recover fees at the requested hourly rates for the hours reported, except for Marshall-Cohen's time (as to which more information is needed). Expenses will be reimbursed in the requested amount less $22.50 in excess transcript charges.

Plaintiffs are ordered to file on or before October 7, 1985 the additional information called for in this opinion, together with a summary of the requested fees and costs for both the Petition and Second Petition (each recalculated in accordance with the rulings in this opinion). Centel will have until October 18, 1985 to file any objection to those recalculated summaries. This Court will then issue its final award.