Mary ROE, Plaintiff,

v.

CITY OF CHICAGO, Defendant.

No. 83 C 2283.

United States District Court,
N.D. Illinois, E.D.

April 27, 1984.

Alpha, Beta & Gamma, Delta & Epsilon, Chicago, Ill., for plaintiff.

Sharon Sullivan, Asst. Corp. Counsel, James Montgomery, City of Chicago Corp. Counsel, Chicago, Ill., for defendant.

*MEMORANDUM OPINION AND ORDER** *

SHADUR, District Judge.

Mary Roe ("Roe") was one of the successful plaintiffs in 42 U.S.C. § 1983 ("Sec-

---

* This is not the usual case of a "Doe" or "Roe" plaintiff designated as such to preserve his or her anonymity (as filed, this action specifically named the plaintiff, victim of an unconstitutional strip search). Instead the bowdlerizing of the opinion is occasioned at the request of plaintiff's counsel, who say (and this Court has no reason to doubt) all their time was spent in good faith and in their client's interest (their letter requesting non-publication of the opinion recognizes the "question of whether this [second-chair lawyering] is a proper charge to the defendant is ... distinct from the question of whether the second lawyer in fact served the interest of our client"). Because many of the considerations identified in this opinion are so

tion 1983") lawsuits against the City of Chicago ("Chicago") stemming from the unconstitutional strip search policy once applied to all female arrestees by Chicago's Police Department. After a short jury trial limited to Roe's damages (Chicago having conceded liability) Roe obtained a $60,000 verdict.

Now Roe seeks attorneys' fees of nearly $48,000 and Chicago resists so large an award. Because the bulk of the lawyers' time preceded this Court's involvement in the case, and also because that earlier period provides the answer to the question of just when the scope of the dispute became limited to damages (by virtue of Chicago's concession on liability)[1], the parties stipulated "the Court may consult with the Honorable Prentice Marshall *ex parte* respecting any and all matters involved in said fee petition." This Court has not literally "consulted" with Judge Marshall, instead simply identifying the question for him and delivering the court papers to him to refresh his recollection. Judge Marshall has answered:

> The issue of liability was not resolved until the final P[re] T[rial] C[onference].

This Court has reviewed each of the nearly 400 entries on the computer printout provided by Roe's law firm, designated "Delta & Epsilon," in that light. That represents a large enough investment of scarce judicial time without trying to attain absolute precision. Reconstruction of whether all the recorded services were in fact necessary is impossible from the printed page, and the extended examination and cross examination required to make a full inquiry would simply compound the problem. For that reason counsel also agreed this Court could draw upon its own background of experience as a practitioner and

as the senior billing partner in a Chicago law firm.

Having completed its review and having made a number of downward adjustments, this Court was still left with the abiding conviction the case was overtried. As the conclusion of this opinion reflects, that called for one final revision. Even after that reduction, this Court believes the remaining allowance is a liberal one—certainly at least fair to Roe's lawyers, and it is believed also fair to Chicago. Some comments are appropriate as to a number of the adjustments made:

■ 1. There is no justification for saddling an opponent with the kind of double-timing by lawyers reflected in this case. What is at work here is an example of what has brought the cost of legal services out of the reach of most of our populace. This was a simple one-incident case, whose facts did not need a team approach to manage its presentation. It was not a "documents" case, so that second-chair counsel was not needed to manage the logistics of handling a paper blizzard that did not exist. Nor was the applicable law so complicated that a lawyer with the excellent credentials of attorney "Alpha," Roe's lead counsel, could not have handled it himself. Time was that a lawyer would try non-complex cases like this without another lawyer as backup at every step of the way—in preparation, in trial and in endless conferences. Economy calls for *research* and *assistance* to be provided by less experienced lawyers (at correspondingly lower hourly rates), but that is intended to cut down the duplication of time and hence the cost. Here the costs were materially *increased* by an increased duplication of effort, and this Court has sought to carve out a substantial number of items reflecting such increase.

often relevant but so seldom articulated by courts passing on fees petitions, this Court has opted for publication, with name changes to minimize the potential for what plaintiff's counsel has called "an unjust impression of our firm not warranted by the totality of the circumstances."

1. Originally assigned to the calendar of this Court's colleague Judge Prentice Marshall, the case was one of those placed on the November 1983 consolidated trial call conducted by Judges Marshall, Moran, Hart and this Court. As a result of that call's random assignment system, it came to this Court for trial.

■ 2. Where a premium is charged for trial time (as was done here, with the computer printout reflecting hourly rates 30–40% higher than for other services), this Court will not extend that premium to the taking of depositions. Whatever justification may exist for a trial-time premium (this Court has spoken jocularly of "combat pay" in *Palmer v. City of Chicago*, 576 F.Supp. 252, 255 (N.D.Ill.1983)), discovery does not stand at all in the same position as time spent in the courtroom.

3. Alpha, ten years out of law school with a first-rate background, has billed for his time at $90 an hour, with a $25 hourly premium for trial time. Both on the supporting affidavit of a prominent Chicago lawyer and from this Court's own knowledge, those figures are reasonable. That certainly cannot be said, though, of the requested $70 per hour rate (and $25 hourly trial time premium) for attorney "Gamma," a lawyer just into his second year in practice and involved in his first federal case. Nor will this Court approve elevating the time of attorney "Beta," a fourth-year associate, to a uniform $75 hourly rate where much of it was rendered in a period when the law firm was charging $65 for his services. This Court has therefore reduced Gamma to a $60 rate (with a $15 trial-time premium) and has restored Beta to his actual billing rates.

■ 4. Counsel's extended involvement in other cases (such as attending the Court of Appeals' argument in the strip search cases on appeal, attending this Court's trial of the *Susan B.* strip search case and conducting numerous cross-conferences with ACLU staff lawyers and counsel in other strip search cases) also cannot fairly be

thrust on Chicago. That kind of self-education may be a commendable effort in career terms, but if imposed on the adversary it would multiply the costs for the defendant unfairly.[2] Chicago's strip search policy was both unconstitutional and unpardonable, but that does not make Chicago an outlaw, and hence fair game for exorbitant fee requests. As it is, this Court may well have left more of such duplicative time intact (because of the sheer difficulty of evaluating a purely paper presentation) than would have survived a full evidentiary hearing.

■ 5. Substitution of Gamma for Beta as Alpha's backup lawyer may in fact be the result of lawyer mobility, as Roe's petition claims. That however is no excuse for imposing on Chicago the inefficiency costs of a law firm's revolving door (it may be noted Gamma has also since left Delta & Epsilon).[3] Gamma's time in having to learn what Beta already knew, to the extent this Court could identify such time, has been disallowed entirely.

■ 6. At trial Roe's counsel sought to recover for a claimed loss of Roe's income. That contrived and less-than-specious claim, which inflated Roe's claimed ad damnum to a clearly excessive amount, was seen by the jury for what it was and rejected entirely.[4] It must be remembered this action ended up as a damages-only litigation. Under those circumstances the discrete loss-of-income damages claim, which the jury rejected so utterly, is the precise equivalent of "the plaintiff [having] failed to prevail on a claim that is distinct in all respects from his successful claims," within the meaning of *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 1943, 76

**2.** What is there to prevent the lawyers in those other cases from including the identical consultation time in *their* fees petitions to other judges, thus even further pyramiding the costs imposed on Chicago? That would apply the fee-generating "team" concept of legal services with a vengeance.

**3.** Indeed, after this opinion had been transcribed and while it was being edited on the word processor, this Court received notice *Alpha* had departed from the firm as well.

**4.** Special interrogatories were provided the jury for the various components of Roe's claimed damages. Although the jury awarded considerably more for emotional harm than this Court would have as the trier of fact, the jury entered a flat zero in the space the verdict provided for the finding of the amount of lost income (if any).

L.Ed.2d 40 (1983). And that rejected claim was in fact the largest claim (by far) asserted by Roe's counsel in asking the jury for an award of a quarter-million dollars. What this Court has done in light of that fact is to disallow some part of the research time (necessarily an estimate) as spent on the unsuccessful claim, plus two-thirds of the aggregate trial time of Alpha and Gamma. In the latter respect such a reduction is really modest, given the fact it has to cover the appropriate disallowance of both (1) the lost-earnings claim and (2) the duplication represented by the presence of two full-time lawyers throughout a trial that really neither required nor justified it.[5]

7. Far too much time was spent on preparation of jury instructions. In the same way, far too much time was spent on preparation of the fees and costs petitions. Hourly rates for experienced practitioners are supposed to reflect experience, and the opponents should not be required to pay for self-education in these areas any more than in others. That too is a form of double recovery: once for the presumed experience that justifies an advanced rate and once for the time a truly experienced lawyer should not have had to spend.

■ 8. None of the time of paralegals and law students has been allowed. Reasonable hourly rates for lawyers include

5. One of the fallout problems caused by this Court's trial bar rules is the increased tendency to have two lawyers doing the in-court work one could really handle alone—a tendency fostered by the need for junior lawyers to obtain "trial experience" to qualify for their admission to the trial bar. To that extent the rules are counterproductive, exacerbating the difficulties posed to the present consumers of legal services, as described in numbered paragraph 1 of the text.

6. Again it should be remembered that all that same overhead (in fact including the paralegals' and law students' salaries) has already been fully absorbed by the lawyers' hourly rates. Though this example may have been outstripped by inflationary trends during the four years since this Court left the practice of law, a lawyer making (say) $100,000 a year and billing (say) 1,800 chargeable hours would have to charge only $55 an hour to cover just his or her own net earnings. As a rule of thumb, allocable overhead (including the cost of *all* non-lawyer personnel) was historically viewed as roughly

overhead and profit, and the kind of messenger services and similar activity charged in this case represents another form of double recovery. Delta & Epsilon (and perhaps other firms) may bill *their* clients in this manner, but this Court (having approved the lawyers' hourly rates as reasonable in specific contemplation of the fact such rates *include* an overhead factor, covering among other elements the time and work of non-lawyer personnel) will not unfairly impose the same burden on the adversary who has not bargained for such treatment—in this case Chicago. Indeed, even under circumstances where the time of such personnel may properly be separately chargeable, it is simply wrong to bill for *them* at $30, $40 and $50 hourly rates that allocate far more than overhead—and purely theoretical overhead, at that—to *their* time.[6] At even $30 an hour for a 40-hour week, the law firm would be charging upwards of $60,000 for a paralegal hired at a fraction of that figure. That is really multiple, not merely double, recovery.

\* \* \*

All the individual disallowances (at the claimed rates) are reflected on the attached photocopies of the Delta & Epsilon printout.\*\* After this Court has given effect to

equal to the lawyer's own earnings, so that a $110 hourly rate would cover both the lawyer's draw and a ratable part of the firm's overhead. Increases in that rate would generate further profits to be shared by the partners. If the lawyer pyramid is broad enough at the base and the hourly rates are high enough, lawyers at the apex of the pyramid can generate incomes once undreamt of in what used to be considered a service profession (thus the current newspaper accounts of the newly-formed Chicago branch of the New York Skadden, Arps firm report Joseph Flom's annual earnings from the law practice at $1 million). When the law firm can also factor into the formula the time spent by the serfs rendering paralegal services, and can charge for that time at exorbitant rates, the potential for further pyramiding of income seems limitless.

\*\* Delta & Epsilon's 31-page computer printout is attached to the official record copy of this opinion. However it is not included in copies prepared for release to legal publication services.

those disallowances, and has then discounted the Beta charges in part to a $65 rate and all of the Gamma charges to $60 an hour (with the $15 trial-time premium), the totals look like this:

|  | Claimed | Disallowed | Allowed at Claimed Rates | Rate Reductions | Net Allowed |
|---|---|---|---|---|---|
| Alpha | 26,441 | 7,029 | 19,412 | – | 19,412 |
| Beta | 6,240 | 2,498 | 3,742 | 240 | 3,502 |
| Gamma | 14,921 | 7,192 | 7,728 | 1,104 | 6,624 |
| Paralegals- law students | 272 | 272 | – | – | – |
| Totals | 47,874 | 16,992 | 30,882 | 1,344 | 29,538 [7] |

Finally, because of the deep conviction that even that resulting number is greatly excessive (largely in terms of two lawyers having spent much of the time when only one was needed) this Court has further reduced the ultimate total by one-half of the aggregate Beta and Gamma amounts, or $5,063, producing a final figure of $24,475. This conclusion has taken into account the cutbacks and discounts previously made, and also has the benefit of an objective benchmark in another comparable litigation tried immediately before *Roe*.[8] And it is also responsive to the admonition in *Hensley*, 103 S.Ct. at 1940, 1942 that hours-times-rate "does not end the inquiry," but that the district court must be mindful of "the relationship between the amount of the fee awarded and the results obtained."[9] Chicago will be ordered to pay that sum to Roe on a schedule to be discussed at the April 27 motion call on this case.

7. Though it reflected only a surface observation on his part, Judge Marshall—whom this Court had *not* asked for more than an answer as to the liability vs. damages question discussed earlier, though the parties' stipulation would have allowed it—volunteered the following addition to his answer:

> Nevertheless $47,000 is too much, in my opinion. Maybe $30,000.

8. Roe was tried back-to-back with *Susan B. v. City of Chicago*, though the trial in the latter was somewhat shorter. Susan B. was represented by a lawyer from one of the major Chicago firms. More than one lawyer was involved at many of the stages in that case as well. Though the *Susan B.* fees petition is just now in the briefing stage, so this Court has not had occasion to apply even a cursory evaluation for possible reductions, the *gross* amount claimed in that case, at the firm's regular hourly rates (quite comparable to those allowed here), is "only" $20,000.

9. In this respect $24,000 bears a reasonable relationship to the $60,000 jury verdict, as $48,000 (under all the circumstances) would not have.