888 F.2d 1151
 52 Fair Empl.Prac.Cas. 1379,
51 Empl. Prac. Dec. P 39,447
Andrew N. JARDIEN, Plaintiff-Appellee,
v.
WINSTON NETWORK, INCORPORATED, a Delaware Corporation and
American Media Network, a Delaware Corporation,
Defendants-Appellants.
 Nos. 88-2700, 88-3437 and 89-1153.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 11, 1989.
Decided Oct. 31, 1989.
 
 Steven M. Levin, Levin & Associates, Chicago, Ill., for Andrew N. Jardien, plaintiff-appellee.
 John A. Dienner, III and Lydon & Griffin, Chicago, Ill., for Winston Network, Inc. and American Media Network, Inc., defendants-appellants.
 Andrew N. Jardien, Chicago, Ill., pro se.
 Before BAUER, Chief Judge, WOOD, Jr., and FLAUM, Circuit Judges.
 HARLINGTON WOOD, Jr., Circuit Judge.
 
 
 1
 Andrew Jardien sued defendant, Winston Media Network ("Winston"),[1] under the Age Discrimination in Employment Act, 29 U.S.C. Secs. 621-634 ("ADEA"). After a jury trial and verdict for the plaintiff, the district court awarded Jardien stipulated damages of $39,673.00. The district court denied Winston's motions for a new trial and judgment notwithstanding the verdict. Jardien was then allowed to file an updated attorneys' fees petition for time spent on post-trial motions. The district court awarded Jardien the full amount of his requested fees of $76,046.00 and costs in the amount of $2,252.22. For the reasons stated below, we affirm on the merits but remand for a new determination of attorneys' fees.[2]
 
 I. AGE DISCRIMINATION CLAIM
 A. Factual Background
 
 2
 In 1962, plaintiff Jardien began work for the John T. O'Flaherty Co. ("O'Flaherty Co."). Jardien's job was to find suitable billboard locations along railroad rights-of-way. Once Jardien secured a billboard location and the display was installed, the O'Flaherty Co. would enter into rental agreements with advertisers for the use of the displays. Thus, Jardien basically functioned as an intermediary between owners of land and advertisers looking for suitable billboard locations. In the industry, Jardien's trade was known as "railroad land leasing." Jardien covered some 75,000 miles of rail for the O'Flaherty Co.
 
 
 3
 Winston performs railroad land-leasing services through its wholly owned subsidiary, Transportation Displays, Inc. ("TDI"). On August 1, 1981, Winston purchased the O'Flaherty Co. and incorporated it into TDI. On that same day, Steve Hawkins offered Jardien, then 58 years old, a landleasing job in TDI's Chicago office. Hawkins, 60 years of age at the time of trial, was a senior vice president at Winston and head of the TDI division.
 
 
 4
 Jardien earned approximately $63,000.00 in his last year with the O'Flaherty Co., receiving commissions on new locations he secured as well as commissions for renewed leases on billboard locations he had secured in previous years. When Jardien accepted Hawkins's offer to work at TDI, Jardien agreed to a flat salary of $35,000.00 per year. After Jardien had been working at TDI for five months, TDI began to pay its land-leasing employees a commission of five percent on the first year rental for new locations.
 
 
 5
 Hawkins assigned Jardien to work at the Chicago office under the supervision of Thomas Kreidler. Approximately two months later, Barbara Stolowski-Bridge, age 24, transferred into the Chicago office from TDI's Philadelphia office. Stolowski-Bridge's transfer brought the total number of persons performing land-leasing services out of TDI's Chicago office to three.
 
 
 6
 Effective September 1982, Hawkins transferred Jardien to work out of TDI's Denver office. For various bookkeeping and budgetary reasons, Jardien moved to TDI's Philadelphia office in January 1984, where his immediate supervisor was John Roberts. While Jardien worked out of TDI's Denver and Philadelphia offices, he continued to reside in Chicago.
 
 
 7
 In April 1984, Stolowski-Bridge transferred out of TDI's Chicago office back to Philadelphia. Because TDI needed another person in Chicago, Hawkins hired Mitchell Mattson, age 27. Hawkins had also recently hired Thomas Parsons, age 26, and Edward Altieri, age 30. Although Hawkins originally hired Parsons and Altieri to do railroad land leasing, both men eventually transferred to other divisions of Winston.
 
 
 8
 During this time, beginning in early 1984, Winston was experiencing a "budget shortfall." Marc Winston, president of Winston, informed Hawkins that TDI's budget would have to be cut. Although payroll cuts were discussed as a method of budget cutting, the exact nature of the budget cuts was evidently left to Hawkins. On May 19, 1984, Hawkins informed Jardien that, because of these budget cuts, Jardien would be let go. At the time of his dismissal Jardien was 61.
 
 
 9
 Subsequently, on June 26, 1984, Hawkins offered Jardien his previous job back, with compensation of $1,000.00 per new location that Jardien secured. On September 10, 1984, Hawkins offered to reinstate Jardien and pay him one month's vacation pay. Finally, on February 18, 1986, Hawkins again offered Jardien his old job if Jardien would bring with him a contract he had previously secured. For various reasons, Jardien rejected all of these offers.
 
 B. Discussion
 1. Sufficiency of the Evidence
 
 10
 Winston first contends that Jardien failed to put on sufficient evidence to establish a claim of age discrimination under the ADEA. For Jardien to prevail, he had to establish that Winston discharged him because of age. Oxman v. WLS-TV, 846 F.2d 448, 452 (7th Cir.1988); La Montagne v. American Convenience Prods., 750 F.2d 1405, 1409 (7th Cir.1984). Jardien could have pointed to direct or circumstantial evidence indicating that age was the determining factor. Oxman, 846 F.2d at 452. Alternatively, Jardien could have used the more common indirect, burden-shifting method of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).
 
 
 11
 Under the McDonnell Douglas method, a plaintiff may set forth a prima facie case of age discrimination by showing (1 ) the plaintiff was in the protected age group; (2 ) the plaintiff met the employer's legitimate performance expectations; (3 ) the plaintiff was discharged despite an adequate job performance; and (4 ) the employer sought a replacement for the plaintiff. Overgard v. Cambridge Book Co., 858 F.2d 371, 375 (7th Cir.1988). The McDonnell Douglas test is difficult to apply in cases where the plaintiff was discharged as a result of a reduction in the employer's work force. Thus, in a reduction-in-force case, the plaintiff does not have to show that the employer sought a replacement. Oxman, 846 F.2d at 455-56.
 
 
 12
 Winston devotes much of its argument to the issues of whether this case qualifies as a reduction-in-force case and whether Jardien has made out a prima facie case. However, analysis of the issues using the terminology of the prima facie case would not be fruitful. After a trial on the merits, the ultimate issue of age discrimination subsumes the elements of the prima facie case. See Overgard, 858 F.2d at 376 ("After a trial on the merits, disputes about the prima facie case fall away."); Kier v. Commercial Union Ins., 808 F.2d 1254, 1257 (7th Cir.1987) (same); Morgan v. South Bend Community School Corp., 797 F.2d 471, 480 (7th Cir.1986); see also United States Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983) (where the district court has all the evidence relevant to the decision regarding the defendant's discrimination, the issue of a prima facie case is irrelevant). Often, when sufficiency of the evidence is at issue in an employment discrimination case, it is less confusing to examine the evidence in its totality rather than trying to sort out which pieces of evidence support specific elements of the prima facie case. Thus, we shall assess whether Jardien presented sufficient evidence that age was a determining factor in Winston's decision to discharge him. See Mathewson v. National Automatic Tool Co., 807 F.2d 87, 90 (7th Cir.1986) (particular method of proof is irrelevant, the main issue is whether plaintiff's age was a determining factor in defendant's decision to terminate).
 
 
 13
 Our role in reviewing the sufficiency of the evidence presented at the trial court is a limited one. This court will not weigh the evidence as a jury would but will only look for substantial evidence to support the jury verdict. Id. In making this determination, we will draw all reasonable inferences that can be drawn from the evidence, and we will view the evidence in the light most favorable to the prevailing party. Christie v. Foremost Ins. Co., 785 F.2d 584, 585-86 (7th Cir.1986).
 
 
 14
 Using this standard, we find abundant evidence in the record to support the jury verdict for Jardien. Through admissions of the defendant's own employees, the plaintiff presented evidence showing that he was meeting the legitimate business expectations of his supervisors.[3] Kreidler, plaintiff's supervisor while at the Chicago office, admitted that Jardien produced the amount of business that Kreidler reasonably expected of him. Hawkins, the man who ultimately discharged Jardien, offered conflicting testimony as to whether he was told that Jardien was a poor business producer. In addition, Hawkins could not state with any certainty what records he looked at to determine Jardien's performance. Finally, the jury could reasonably infer that Hawkins's willingness to offer Jardien his old job back indicated that Hawkins believed Jardien to be an adequate business performer.[4]
 
 
 15
 Perhaps most damaging to the defendant's case was its hire of three younger employees in the months before Jardien's discharge. Jardien even trained several of these employees. On the basis of Hawkins's testimony, Winston asserts that two of these employees transferred out of the TDI division before Jardien's discharge and are therefore irrelevant to this case. Jardien, however, offered a previous statement by Hawkins that these same two employees had worked at TDI for periods of six to eight months, transferring well after Jardien's discharge. A jury could reasonably infer that TDI was grooming these new, younger employees to replace Jardien.
 
 
 16
 Kreidler made several admissions regarding his preference for younger employees that he could personally train. Winston attempts to belittle these admissions as not relevant to Jardien's discharge. After all, Winston argues, it was actually Hawkins and not Kreidler who made the decision to terminate Jardien. We have held that actions and comments by employees not involved in a discharge decision cannot provide a basis for charging other employees with discrimination. See Williams v. Williams Elecs., Inc., 856 F.2d 920, 925 (7th Cir.1988). We have also held that where the discharging official made the discharge decision alone, discriminatory thoughts and motives of lower officials cannot be attributed to the discharging official. La Montagne v. American Convenience Prods., 750 F.2d 1405, 1412 (7th Cir.1984). In this case, a jury could reasonably conclude that Hawkins accepted Kreidler's input in deciding to discharge Jardien. Hawkins testified that he did not send Jardien back to Chicago to keep Kreidler happy and that Hawkins generally acquiesced in Kreidler's hiring decisions. Thus, Kreidler's statements and beliefs provide a further basis to support the jury verdict.
 
 
 17
 The defendant also points toward contradictory evidence that it claims undermines the plaintiff's charges of age discrimination. For example, Winston argues that many witnesses contradicted the plaintiff's testimony regarding a statement allegedly made by Hawkins about the company's "emphasis on youth." Winston also draws this court's attention to testimony regarding an alleged personality conflict between Jardien and his supervisor, Kreidler. However, it is for the jury and not this court to weigh conflicting evidence. See United States v. Alamo, 872 F.2d 202, 207 (7th Cir.1989). In employment discrimination suits, the credibility of witnesses is often crucial. Christie v. Foremost Ins. Co., 785 F.2d 584, 586 (7th Cir.1986). Appellate courts should not interfere with the jury's determination as to which witnesses to believe. See Valbert v. Pass, 866 F.2d 237, 241 (7th Cir.1989). Therefore, we shall not interfere with the jury's obvious choice to believe Jardien's evidence over Winston's evidence. In sum, we find ample evidence to support the jury verdict in favor of Jardien.
 
 2. Evidentiary Rulings
 
 18
 Without reference to any legal authority or standard of review, Winston also contests two evidentiary rulings that the trial court made. First, Winston contends that the trial court erroneously excluded sales commission records and their compilation[5] for Jardien, Kreidler, and Stolowski-Bridge; Winston argues these exhibits would have revealed that Jardien was a poor business performer. Second, Winston asserts that it should have been allowed to elicit testimony regarding its other older employees.
 
 
 19
 The trial court concluded the sales commission records were not relevant to the case because the defendant laid no foundation that they were used in making the discharge decision.[6] "The trial court has substantial discretion in making these types of evidentiary rulings.... This court will not overturn these evidentiary decisions in the absence of a clear abuse of discretion." FTC v. Amy Travel Serv., Inc., 875 F.2d 564, 572 (7th Cir.1989). On cross-examination Jardien effectively discredited Hawkins's claim that he relied on the sales commission records when making the discharge decision. Given this contradictory testimony, we cannot find that the trial court abused its discretion in refusing to admit the sales commission records for a lack of foundation.
 
 
 20
 Next, Winston argues that it was prejudiced by the exclusion of testimony relating to its employment of older individuals. Winston sought to have the plaintiff admit that Jack Sullivan, one of Winston's employees in the Chicago office at the same time as the plaintiff, was seventy-years old. The defendant also sought to have its employee, Hawkins, testify that he had hired several men in their sixties. Because Sullivan worked in a different division of Winston than did the plaintiff, the trial court excluded testimony about Sullivan on the grounds of relevancy. The trial court excluded testimony regarding the other men partly on grounds of relevancy and partly as a sanction because the defendant had not revealed their names in discovery. The trial court could reasonably conclude that these other employees were not relevant to the issues at trial either because they were hired after the plaintiff's discharge or because they performed jobs not comparable to the plaintiff's job. Thus, the trial court did not abuse its discretion in excluding the testimony regarding other employees of Winston.
 
 
 21
 As a sanction for obstructing discovery, the trial court also had power to exclude testimony regarding Winston employees. See Fed.R.Civ.P. 37(b)(2)(B). A district court's decision to exclude evidence as a sanction for improper discovery tactics is reviewed under an abuse-of-discretion standard. See Magnus Elecs. v. Masco Corp., 871 F.2d 626, 631 (7th Cir.1989); Tamari v. Bache & Co., 729 F.2d 469, 472 (7th Cir.1984). Although the record is unclear and confusing, there is evidence to suggest that defendant did not reveal the names of the employees it sought to introduce despite plaintiff's interrogatories that should have elicited the information. The trial court did not abuse its discretion in the present case.
 
 3. Jury Instructions
 
 22
 a. Mitigation Instruction
 
 
 23
 Winston assigns error in the trial court's refusal to give its jury instruction number eight. This jury instruction would have directed the jury to reduce the plaintiff's damages if the jury found that the plaintiff could have mitigated his damages by seeking out or taking advantage of a business opportunity or employment. Jardien responds that the parties' stipulation regarding damages obviated the need for a mitigation instruction.
 
 
 24
 For Winston to assign error for failure to give this instruction, it must have objected thereto before the jury retired to consider its verdict, stating distinctly the matter objected to and the grounds of the objection. Fed.R.Civ.P. 51. However, Winston never objected to the trial court's refusal to give this instruction. The entire relevant colloquy at the instruction conference consisted of the following:
 
 
 25
 THE COURT: Then there was Defendant's No. 8, Fifth Circuit information, Instruction on Mitigation. Do you want to state your objection?
 
 
 26
 MR. LEVIN [plaintiff's counsel]: Yes, Judge. There is no issue in the case that we have stipulated to what his lost wages are subject to our agreement that if Mr. Dienner finds something out after the fact that it can be--
 
 
 27
 THE COURT: This was talking about taking any reasonable opportunity to reduce or minimize the loss of [sic ] damage and this was the one about the employment opportunities.
 
 
 28
 Do you remember which one you're talking about?
 
 
 29
 MR. DIENNER [defendant's counsel]: Yes, I remember that, Judge. That's the one where because one month after he was let go, one month, Steve Hawkins offered to pay him a thousand dollar a location and he declined that offer.
 
 
 30
 THE COURT: Do you remember that now?
 
 
 31
 MR. LEVIN: Yes, and what he did was assume other employment and what your Honor observed at that time was that the law does not--or probably does not--require a man to go back to work at the place that discriminated against him as long as he has obtained other employment.
 
 
 32
 THE COURT: Well, it was more than that. It wasn't the same job, it wasn't the same salary, it wasn't the same circumstances and he doesn't have to mitigate the offense against him by going back to the people who offended him.
 
 
 33
 MR. DIENNER: On the thousand dollars a location, he would do that out of his own home, not reporting to anybody.
 
 
 34
 THE COURT: I know all that. It's not the same job, it's a different job, it's less money on the facts, but more than that, he doesn't have to go back to the people who have fired him for discrimination and believe they won't discriminate against him again. If he has a cause of action, he has a cause of action and to go back to them is in the nature of settlement rather than mitigation.
 
 
 35
 [Let's go on to] Defendant's No. 10.
 
 
 36
 MR. DIENNER: You're refusing No. 8, sir?
 
 
 37
 THE COURT: Yes.
 
 
 38
 The litigants and the trial court then moved on to consider other proposed jury instructions; no further mention of the mitigation instruction was made. The defense counsel's inquiry as to the court's decision on instruction number eight can hardly constitute an objection. We will not parse the record to find an implied objection when the litigant could have simply articulated an objection at the jury instruction conference.
 
 
 39
 Rule 51 clearly provides that the party objecting to the refusal of a proposed instruction must object and state the reasons. This court will not ignore the clear mandate of Rule 51. See Deppe v. Tripp, 863 F.2d 1356, 1361-62 (7th Cir.1988) (refusing to apply the plain error doctrine to the review of jury instructions). To preserve jury instruction issues for appellate review, litigants must ensure that the record contains sufficient information for this court to ascertain the basis for the objection at the jury instruction conference. Because the defendant failed to make any objection, let alone state its reasons thereto, we hold that it waived its right to contest the refusal of the mitigation instruction on appeal.
 
 
 40
 b. Metz Instruction
 
 
 41
 Defendant next asserts that the trial court erred by giving plaintiff's instruction number twenty-one, taken from our decision in Metz v. Transit Mix, Inc., 828 F.2d 1202 (7th Cir.1987). Plaintiff's instruction number twenty-one read:
 
 
 42
 The salary savings that can be realized by replacing a single employee aged 60, with a younger, lower-salaried employee does not constitute a permissible, non-discriminatory justification for the replacement.
 
 
 43
 The defendant correctly points out that the Metz decision relies on a positive relationship between salary and age. See id. at 1208-09 (discussing relationship between higher pay and age). The defendant contends that the trial court should not have given the Metz instruction because Jardien was a new hire, and, therefore, his high salary could not have reflected his seniority. But Jardien did put forth evidence, by the admissions of the defendant's own employees, that his salary level at Winston was a recognition of his experience in the industry, albeit experience gained at a business other than Winston. Because sufficient evidence was in the record to suggest that Winston may have attempted to justify Jardien's dismissal as a salary savings, we cannot find that the trial court committed error in giving the Metz instruction. See Kirschner v. Broadhead, 671 F.2d 1034, 1040 (7th Cir.1982); Mroz v. Dravo Corp., 429 F.2d 1156, 1163-64 (3d Cir.1970). In any event, even if the Metz instruction was inapplicable to the facts of this case, it was a correct statement of the law, and jury instructions that correctly state the law rarely justify reversal. Padgett v. Southern Ry., 396 F.2d 303, 309 (6th Cir.1968).
 
 4. Conduct of Trial Judge
 
 44
 Winston also assigns error in the trial judge's conduct at the trial. Winston asserts that the trial judge improperly restricted its cross-examination of the plaintiff and that the trial judge made prejudicial comments during the course of trial. Of course, the trial judge has great discretion in conducting the trial. See United States v. Spivey, 841 F.2d 799, 803-04 (7th Cir.1988). Our examination of the record revealed no inappropriate remarks by the trial judge.
 
 
 45
 During cross-examination of the plaintiff, the trial court sustained objections on the grounds that defendant's counsel was making arguments by asking questions not supported by the evidence.[7] The trial court has broad discretion to control the mode and order of cross-examination. See generally Fed.R.Evid. 611(a) & advisory committee's note. We will not interfere with the trial court's discretion to keep cross-examination within reasonable bounds.
 
 
 46
 Winston also argues that several comments made by the trial court prejudiced the jury against the defendant. An examination of the record reveals that the trial court chastised both plaintiff's and defendant's counsel on several occasions to keep the trial moving. In view of the trial court's duty to run its courtroom in a prompt, orderly, and efficient manner, we cannot find that the trial court made any inappropriate remarks.
 
 II. ATTORNEYS' FEES
 A. Factual Background
 
 47
 After a six-day trial on the merits, Jardien filed a petition for attorneys' fees in the amount of $63,250.00 plus $1,932.22 in costs. Contesting the jury verdict, Winston then filed post-trial motions for judgment notwithstanding the verdict, directed verdict, a new trial, and for an amendment of the judgment pursuant to Fed.R.Civ.P. 59. Jardien also sought an amendment of the judgment for additional damages suffered since the jury verdict. The parties agreed to withdraw their respective Rule 59 motions, and the trial court dismissed the remainder of the defendant's post-trial motions. Subsequently, Jardien filed a supplemental petition for attorneys' fees, requesting $12,796.00 plus $320.00 in costs for time spent on all post-trial motions. In total, the two petitions requested fees for 587.8 hours of time, billed at rates ranging from $100.00 to $160.00 per hour.
 
 
 48
 Jardien was represented by two attorneys. Attorney Levin was Jardien's lead counsel, and attorney Kohn assisted Levin both at trial and in the preparation of the case. At trial, Kohn participated as "second chair"; nevertheless she did not conduct any direct or cross-examinations, make the closing argument or opening statement, participate in the jury instruction conference, or voice a single objection.
 
 
 49
 The trial court found that the numerous hours that plaintiff's attorneys billed were due to the "obstreperousness and contentiousness" of the defense counsel. Trial Court Mem. Op. at 1. In addition, the trial court concluded that the hourly rates of plaintiff's counsel were "reasonable considering the prevailing rates in the Chicago area and the complexity of this case." Id. Therefore, the trial court awarded plaintiff the full amount of his request for $76,046.00 in attorneys' fees plus $2,252.22 in costs.
 
 B. Discussion
 1. General Principles
 
 50
 Winston contests the amount of attorneys' fees awarded on three grounds.[8] First, Winston asserts that the trial court erroneously arrived at the hourly rates used in its computation of attorneys' fees. Second, Winston argues that the district court should have considered the contingent fee arrangement between plaintiff and his counsel. Third, Winston points toward excessive time that the trial court should have trimmed from the attorneys' fee petition.[9] We find that the district court did not adequately consider duplicative time in the fee petition and remand for a redetermination of attorneys' fees.
 
 
 51
 Under the ADEA, a prevailing plaintiff may recover reasonable attorneys' fees. See 29 U.S.C. Sec. 626(b) (incorporating remedies of 29 U.S.C. Sec. 216). This court will not disturb an award of attorneys' fees unless it clearly appears that the district court abused its discretion. Nanetti v. University of Illinois, 867 F.2d 990, 995 (7th Cir.1989); Kossman v. Calumet County, 849 F.2d 1027, 1030 (7th Cir.1988); Freeman v. Franzen, 695 F.2d 485, 494 (7th Cir.1982), cert. denied, 463 U.S. 1214, 103 S.Ct. 3553, 77 L.Ed.2d 1400 (1983). A trial court can abuse its discretion when it overlooks essential evidence or fails to consider relevant factors. See Kasper v. Board of Election Comm'rs, 814 F.2d 332, 339 (7th Cir.1987) (" 'Abuse of discretion' means a serious error of judgment, such as reliance on a forbidden factor or failure to consider an essential factor.").
 
 2. Hourly Rate
 
 52
 The trial court set the hourly rates for the fee award at amounts ranging from $100.00 to $160.00. The trial court found these rates to be reasonable "considering the prevailing rates in the Chicago area and the complexity of the case." Trial Court Mem. Op. at 1. In a properly functioning market, a "reasonable fee" should approximate the prevailing market rate in the relevant community. See Blum v. Stenson, 465 U.S. 886, 895, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984);[10] Tomazzoli v. Sheedy, 804 F.2d 93, 98-99 (7th Cir.1986). The trial judge is better situated than this court to assess the reasonableness of an hourly rate, because he can consider both the experience of the attorneys involved and the rates charged by other Chicago lawyers. Lightfoot v. Walker, 826 F.2d 516, 524 (7th Cir.1987); Lynch v. City of Milwaukee, 747 F.2d 423, 428 (7th Cir.1984).
 
 
 53
 In the instant case, there was enough evidence for the trial judge to determine the appropriate rate. Both parties submitted affidavits from Chicago lawyers. There was also some evidence that Jardien had contracted to pay one of his attorneys at the rate of $140.00 per hour for out-of-court time and $160.00 per hour for in-court time. The defendant had even agreed to pay its attorney approximately $150.00 per hour. While not dispositive, these market transactions are highly relevant to the "reasonable rate." Tomazzoli, 804 F.2d at 98; Lynch, 747 F.2d at 428 n. 4.
 
 
 54
 Nevertheless, we find it difficult to discern exactly why the trial court made its findings regarding the hourly rates. Because we find it necessary to remand on the issue of duplicative time, we suggest the trial court also make new, more detailed findings on what constitutes a "reasonable rate" for this case.
 
 3. Plaintiff's Fee Arrangement
 
 55
 According to a letter included in the defendant's brief, Jardien had agreed to pay his attorney no more than $5,000.00, regardless of the outcome. Winston finds error in the district court's failure to refer to this agreement.
 
 
 56
 A private fee arrangement between plaintiff and counsel does not serve as a ceiling on the amount of attorneys' fees that the prevailing plaintiff may recover. Blanchard v. Bergeron, --- U.S. ----, 109 S.Ct. 939, 944-45, 103 L.Ed.2d 67 (1989). When the plaintiff's fee arrangement is less than a reasonable fee, the defendant is required to pay the higher amount. Id., 109 S.Ct. at 944. The fee arrangement between Jardien and his counsel can still be relevant as evidence of a reasonable fee. Id.; Lenard v. Argento, 808 F.2d 1242, 1247 (7th Cir.1987). On remand, the trial court should consider the relevancy, if any, of Jardien's fee arrangement with his attorney.
 
 4. Duplicative and Excessive Time
 
 57
 At trial, the plaintiff was represented by two attorneys: Levin and Kohn. Levin conducted the trial while Kohn's participation would be described in common parlance as a "second chair." Kohn participated at trial by taking notes, discussing trial strategy with Levin, and organizing trial materials. The plaintiff contends that Kohn's presence was necessary to allow Levin to devote his complete attention to presenting matters to the jury. The defendant also attacks the amount of time that both Levin and Kohn spent preparing various court documents.
 
 
 58
 Of course, duplicative and excessive time, not reasonably billed to one's own client, cannot be billed to an adversary through a fee-shifting statute. See Hensley v. Eckerhart, 461 U.S. 424, 434, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983). While we have refused to lay down a flat rule of one lawyer per case, Lenard v. Argento, 808 F.2d 1242, 1244 (7th Cir.1987), the tendency of law firms to overstaff a case should cause the trial court to scrutinize a fees petition carefully for duplicative time, see Hensley, 461 U.S. at 434, 103 S.Ct. at 1940; see also Roe v. City of Chicago, 586 F.Supp. 513, 514 (N.D.Ill.1984).
 
 
 59
 In this case, it appears that the trial court did not adequately parse the fees petition for excessive or duplicative time. Our examination of the record reveals between eighty to one hundred hours where attorneys Levin and Kohn may have attended the same conference, deposition, or court proceeding. Although on remand the trial court should make specific findings, it appears that a substantial portion of Kohn's attendance at trial was not fully justified. Also, numerous entries in Jardien's fees petition indicate an excessive amount of time for drafting court documents. Although defense counsel's "obstreperousness and contentiousness" may have caused Jardien's attorneys to draft these documents in the first place, the amount of time it took to research and draft these various documents should not have been affected.
 
 
 60
 Where we can easily discern the amounts of excessive or duplicative time and where the interests in expediting litigation dictate, we have cut the fees petition ourselves. See Ustrak v. Fairman, 851 F.2d 983, 989 (7th Cir.1988) (citing cases). In this case, the record does not allow us to decipher what hours were duplicative or excessive. The fees petition is often ambiguous as to how much time was spent on certain kinds of work. Where we find potentially duplicative time, we cannot tell whether it was Levin's or Kohn's participation that was unnecessary, and the difference in the hourly rates makes this distinction important. Thus, we find it necessary to remand this case to the trial court for a redetermination of attorneys' fees.[11]
 
 III. CONCLUSION
 
 61
 We affirm the judgment of the trial court on the merits. Because we find that the trial court failed to adequately consider possibly duplicative and excessive time in its award of attorneys' fees, we reverse and remand only for a new determination of fees in accordance with this opinion. Each party to bear their own costs on this appeal.
 
 
 62
 AFFIRMED IN PART, REVERSED IN PART AND REMANDED.
 
 
 
 [1]
 Effective January 1, 1988, Winston Media Network, Inc. changed its name to "American Media Network, Inc." The district court modified its original judgment to place liability on Winston under its new name
 
 
 [2]
 This opinion involves three consolidated appeals: numbers 88-2700, 88-3437, and 89-1153. Case number 88-2700 involves the appeal on the merits of the case. In case number 88-3437, Winston appealed from the court order awarding attorneys' fees. Because no final judgment was entered on this court order, the appeal was not timely. See Fed.R.Civ.P. 58 (requiring every judgment to be set forth on a separate document). Subsequently, the district court entered judgment on its previous order, and Winston timely filed an appeal that was docketed as case number 89-1153. This opinion disposes of all three appeals
 
 
 [3]
 Winston also correctly asserts that a mistake or error in its judgment as to Jardien's performance would be a sufficient justification for Jardien's dismissal. See Pollard v. Rea Magnet Wire Co., 824 F.2d 557, 559 (7th Cir.), cert. denied, 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987). Winston presented little, if any, evidence to support this theory. In any event, we find sufficient evidence in the record to indicate that Winston, acting through its employees, was not mistaken about Jardien's business performance
 
 
 [4]
 Defendant also points to sales commission records and a compilation of these records as evidence of Jardien's poor business performance. However, the trial court excluded these exhibits, and we will not consider inadmissible evidence in deciding whether the plaintiff submitted sufficient evidence to support the jury verdict. See Arney v. United States, 479 F.2d 653, 659 (9th Cir.1973) (refusing to consider hearsay evidence in reviewing grant of summary judgment); Norris v. United States, 423 F.2d 695, 695-96 (9th Cir.), cert. denied, 400 U.S. 838, 91 S.Ct. 76, 27 L.Ed.2d 71 (1970). For reasons explained later, infra Part I.B.2, we conclude that the trial court did not abuse its discretion in excluding these exhibits
 
 
 [5]
 Because it is unclear whether the defendant ever actually offered the compilation into evidence, there is some question as to whether defendant contests its exclusion. Obviously, if the defendant did not offer the compilation into evidence, there can be no error in its exclusion. If the defendant offered the compilation into evidence, we conclude that the trial court correctly excluded it for the same reasons we conclude that the trial court correctly excluded the underlying sales commission records
 
 
 [6]
 Winston attempts to make much out of the fact that Jardien objected to the admission of these records on foundation grounds rather than relevancy grounds. The issues of relevancy and authentication are inextricably linked. See United States v. Blackwell, 694 F.2d 1325, 1330 (D.C.Cir.1982) ("Authentication and identification are specialized aspects of relevancy...."); J. Weinstein & M. Berger, Weinstein's Evidence p 901(a) (1983). It is inconsequential whether Jardien framed his objection in terms of authentication or relevance
 
 
 [7]
 In its brief, defendant contended that the trial court sustained objections to its cross-examination, "in part, on the ground that the questions being put to the party-opponent were 'leading.' " Defendant's Brief at 30. At oral argument, in response to a specific inquiry from this court, defendant's counsel once again represented that the trial court sustained the plaintiff's objections on the grounds that the defense counsel was leading the witness. Our examination of the record reveals, however, that the trial court was concerned not with the leading nature of defense counsel's questions but with defense counsel's tendency to ask questions that argued facts not in evidence
 
 
 [8]
 In the primary appeal, Winston referred this court to an opinion vacated by the United States Supreme Court. To support its appeal on the issue of attorneys' fees, Winston cites one of our opinions that was withdrawn from publication and printed elsewhere. In addition, Winston cited a Supreme Court opinion without referring us to its modification upon reargument. We remind Winston's counsel of his duty of diligence toward this court, a duty that requires counsel to check thoroughly each citation submitted to this court. See Kawitt v. United States, 842 F.2d 951, 954 (7th Cir.1988) (persistent citation of vacated case warranted sanctions against attorney on appeal)
 
 
 [9]
 Winston also apparently attacks the brevity of the trial court's opinion regarding attorneys' fees. The conclusory nature of the trial court opinion in this case does not warrant reversal. Cf. Connolly v. J.T. Ventures, 851 F.2d 930, 935-36 (7th Cir.1988) (where there is no evidence to suggest that the district judge failed to consider the relevant factors, the award of attorneys' fees will be upheld). We do request, however, that district judges explicitly state the reasons for their conclusions when awarding attorneys' fees. See Hensley v. Eckerhart, 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983); Lenard v. Argento, 808 F.2d 1242, 1247 (7th Cir.1987)
 
 
 [10]
 Although the Blum case was decided under the Fees Award Act, 42 U.S.C. Sec. 1988, precedents under Sec. 1988 are relevant to ADEA proceedings. See Kossman v. Calumet County, 849 F.2d 1027, 1031 (7th Cir.1988) (appropriate to consider Sec. 1988 precedent when deciding ADEA case); Heiar v. Crawford County, 746 F.2d 1190, 1203 (7th Cir.1984) (same), cert. denied, 472 U.S. 1027, 105 S.Ct. 3500, 87 L.Ed.2d 631 (1985)
 
 
 [11]
 We find the remainder of the defendant's arguments, including its contention that plaintiff's counsel should not be compensated for time spent pursuing a Fed.R.Civ.P. 59 motion, to be without merit