**Leonard KOVAL, etc., Plaintiffs,**

v.

**PAINEWEBBER HOUSING AND HEALTHCARE FUNDING, INC., Defendant.**

**Nos. 88 C 6020, 88 C 8766.**

United States District Court, N.D. Illinois, E.D.

Nov. 16, 1989.

Gary L. Starkman and Marc C. Smith, Arvey, Hodes, Costello & Burman, Chicago, Ill., for plaintiffs.

Bruce R. Meckler, Phelan, Pope & John, Ltd., Chicago, Ill. and Robert C. Seldon, Krooth & Altman, Washington, D.C., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

At the March 22, 1989 status hearing in this action, this Court ruled that a clear violation of the Federal Rules of Civil Procedure ("Rules") dealing with discovery—the failure of counsel for Leonard Koval ("Koval") to comply with the discovery requests from PaineWebber Housing and Healthcare Funding, Inc. ("PaineWebber")—called for the payment under Rule 37(a)(4) by Koval's counsel (with no passing on to the client) of the reasonable expenses, including attorney's fees, incurred by PaineWebber. As for the measure of those expenses, this Court said (Tr. 6):

> And that is not to be viewed—cost is not to be viewed—simply as starting with the time of filing this motion. It's the but-for cost that attached to the noncompliance with the discovery request from the outset of the kind of intransigent responses that I see here.

After an unsuccessful effort to seek agreement on the amount of that award as this Court had urged (*id.*), PaineWebber filed a Petition for an Award of Attorneys' Fees ("Petition"), to which Koval has filed his Response to Defendant's Fee Petition

("Response"). This Court has reviewed the parties' submissions and has revisited the dispute that triggered them, and this opinion deals with the amount to be awarded.

It must be confessed that this Court's initial reaction to the Petition was one of substantial incredulity—after all, charging $27,000 for a discovery dispute of what should have been minor proportions? To this Court's experience in private practice as the senior billing partner in a small law firm by today's standards—a firm almost identical in size to Krooth & Altman, the law firm representing PaineWebber[1]—it has added nine years of periodically reviewing lawyers' time and billing from the vantage point of the judge, and the requested amount seemed extraordinarily high on first blush. That initial impression of gross overkill was partially dispelled by the detailed explanation given by Krooth & Altman partner Robert Seldon ("Seldon") in his 16–page affidavit that makes up the bulk of the Petition. But "partially dispelled" is used advisedly: As the discussion in this opinion will explain, the requested amount must be cut back a good deal, although the award remains a substantial one.

At the outset brief mention should be made of an issue posed by Response at 2–6: a request for reconsideration based on the notion that the lawyers' face-to-face conference required by this District Court's General Rule ("GR") 12(k) was unsuccessful due in whole or in part to the "fault" of PaineWebber's counsel. That argument must be rejected as reflecting a skewed notion of "fault"—something that reflects much the same mindset and approach to the litigation process on the part of Koval's counsel that created the controversy in the first place. Koval's counsel continue to portray events through a distorted lens. But objectively viewed, the aborted GR 12(k) conference was plainly the result of fault on Koval's side and not on PaineWebber's.[2]

There is no occasion to reconsider this Court's original determination that Koval's counsel were at fault in having violated the discovery rules, presenting what Mar. 22 Tr. 2 described as "a total picture that has to be viewed by the objective reader as one of just playing hardball—you know, treating discovery as a kind of litigation weapon rather than as a means of factual investigation."[3] It cannot fairly be said that Koval's "opposition to the motion was substantially justified or that other circumstances make an award of expenses unjust" (Rule 37(a)(4)). That being so, the Rule mandates the imposition of expenses including fees.[4] It is time, then, to turn to the issue of quantification.

Koval's Response at 7 eschews any questioning of "the billing mechanics of defense

---

**1.** Of course the going hourly rates charged by lawyers in 1980, the time of this Court's career change, are beggared by today's rates.

**2.** It also bears mention that the underlying purpose of GR 12(k), as Response at 4 itself recognizes, is to spare the court and not the litigants—it sets a face-to-face conference as a precondition to invoking judicial intervention, but it does so to spare premature calls on the court's time. Here there is no question that the dispute was ripe (if not overripe) when it was brought into court. If this Court has no serious complaint about the lawyers' meeting the preconditions to a discovery motion—and it does not here—any arguable noncompliance certainly forms no basis for a litigant's objection to the sanction that is mandated by Rule 37(a)(4) for a violation of the Federal Rules of Civil Procedure (which of course stand at a higher level than any local rule of procedure).

**3.** In an instance of presumably unintended irony, Koval's Response at 4 raises the very specter of "hard ball litigation tactic[s]" as part of its argument against PaineWebber based on GR 12(k).

**4.** Nor is any credence to be given to the argument in Response at 5 n. 4:

> Because the court's authority to award sanctions is limited by the literal terms of Rule 37(a)(4) to situations in which "the motion is granted," we contend, as an alternative to the argument advanced in the text, that there is no basis for awarding sanctions when, as here, the motion is denied as moot.

That challenge to this Court's power to deal with the tactics of Koval's counsel is rejected—and if the argument did have any formalistic force, this Court would invoke its inherent power over the management of litigation to reach the same result. That last determination also applies with equal force to Koval's argument that the fee-shifting in this case should be limited to the last steps that PaineWebber's counsel had to take to bring the matter before this Court.

counsel, their experience and expertise or the hourly rates that they customarily charge" as well as any need for an evidentiary hearing. Hence the issue comes down to one of determining the reasonable time required. As Response *id.* (citations omitted) would have it:

> Given the minimal amount of time reasonably necessary to handle this issue, the lack of novelty or difficulty in the question presented and the limited skill required to perform the legal services, the Court should determine "the number of hours actually worked that were reasonably necessary to the successful claim, thereby excluding excessive or redundant time, and then [multiply] this figure by a reasonable hourly rate for each attorney who worked on the case."
> ... This calculation must be made with the understanding that "the number of hours actually worked rarely equals the number of hours reasonably expended...."

Something—maybe even a good deal—could be said for a rule that, under circumstances such as those presented here, would instead simply shift *all* the aggrieved party's fees and other expenses to the offending litigant or lawyer. After all:

1. In purely proximate-causal terms (the but-for standard), the services would not have been rendered at all had it not been for the Rule-violative conduct.

2. Because the services were rendered at a time when there was no assurance of fee-shifting, any notions of overkill (or overbilling) must carry the implication that the lawyers were spending unreasonable amounts of time to milk their own clients. That of course may happen,[5] but courts should be entitled to rely on free market principles as causing lawyers to stop performing additional work at the point that the marginal cost (including any risk of client displeasure or outright rejection) would exceed the perceived marginal gain.

3. Once the just-stated principle is recognized, any fee-shifting decision involves a choice between (a) the Rule-offending adversary whose misconduct triggered the rendition of services in the first place and (b) the client that—though innocent—will be forced to pay the bill to the extent that fee-shifting does not take place.[6] It seems clearly preferable that the former and not the latter ought to be saddled with the expense.

4. There are real and often major judicial costs involved in reviewing fee awards, with no concomitant costs borne by the litigants (for there is no predicate for reimbursing the system for such costs, even at the bargain hourly rates into which judicial salaries and related costs of the justice system would translate[7]). Accordingly an objector need not weigh, in normal market terms, the true total marginal cost of posing the issue of allegedly excessive fee claims against the marginal gains likely to be produced by interposing the objection. Were the equation a different one, the offending party would have to compare the hoped-for reduction in the fee award, discounted to reflect the unlikelihood of winning

---

5. We do not always focus on the inherent everyday conflict between lawyers and their clients, in which the clients necessary depend on their lawyers to minimize the time (and therefore the client's money) the lawyers are required to spend on the representation. By definition the lawyer's conscientiousness and professionalism are important protections for the client, but essentially the system depends on market considerations to govern the relationship. Certainly no serious consideration has been given to the possible alternative of regularized judicial oversight of lawyers' fees.

6.. It is of course possible that a court's ruling finding such services unreasonable for fee-shifting purposes might trigger a pro tanto reduction, at the client's insistence (or even voluntar-

ily by the lawyer), of what the lawyer had already charged the client. Such an outcome might be seen as a real anomaly, under which a law firm that *not* been the victim of sanctionable conduct by the other side would be subject to *no* judicial scrutiny of the unreasonableness of billing previously rendered to the client, while the law firm that *had* been the victim of such conduct would stand the prospect of having its fees—not previously questioned by its own clients—reduced as a result.

7. This may be a slight overstatement. There have been a few District Court cases requiring payment to the court for such systemic costs as an "appropriate sanction" under Rule 11 (see, e.g., *Dyson v. Sposeep,* 637 F.Supp. 616, 624 (N.D.Ind.1986) and authorities cited there).

such a reduction, with the sum of (a) the added cost to the offending party of its lawyers' effort to gain the reduction [8] plus (b) the added cost of the incremental services the injured party must bear in fighting the reduction, discounted to reflect the injured party's chances of successfully resisting the reduction, *plus* (c) the added judicial system costs involved in the challenge, again discounted in the same way as item (b).[9] If the value of the hoped-for reduction (the discounted first item) is greater than the sum of the other items, the effort to obtain the reduction will presumably be made because the game is worth the candle; but if not, the presumably rational litigant should not expend further resources in fighting the requested amount of fee-shifting. But because no item (c) is now plugged into the calculation, the risks are different to that extent, and the wrongdoer will have the incentive to make some challenges that would not otherwise be undertaken.

5. No court, however experienced in the law practice the judge may have been before taking the bench, can feel comfortable with trying to reconstruct the reasonableness of fees viewed from the outside and in hindsight. Should a brief have taken 10 or 15 or 20 hours to research and write? Was the intraoffice conference really necessary and constructive or just the inevitable result of the presence of more than one lawyer in the case? Even more fundamentally, was the matter one that a single lawyer

could and should have managed throughout rather than involving others in the firm? [10]

But whatever might be said for such a free-market approach if this Court were writing on a clean slate, that is not the way in which the law of fee-shifting has developed, either under Rule 37(a)(4) or elsewhere. Indeed, even as this opinion was in the process of final revision and transcription, this Court received (as part of the weekly batch of slip opinions from our Court of Appeals) the decision in *Jardien v. Winston Network, Inc.*, 888 F.2d 1151 (7th Cir.1989), which in part reversed and remanded a fee award under ADEA because "it appears that the trial court did not adequately parse the fees petition for excessive or duplicative time" (*id.* at 1160). That remand flowed inevitably from the Court's perception of the Supreme Court's teaching in the area, coupled with a healthy skepticism as to law firm practices (*id.* at 1160–61):

> Of course, duplicative and excessive time, not reasonably billed to one's own client, cannot be billed to an adversary through a fee-shifting statute. *See Hensley v. Eckerhart*, 461 U.S. 424, 434 [103 S.Ct. 1933, 1939, 76 L.Ed.2d 40] (1983). While we have refused to lay down a flat rule of one lawyer per case, *Lenard v. Argento*, 808 F.2d 1242, 1244 (7th Cir.1987), the tendency of law firms to overstaff a case should cause the trial court to scrutinize a fees petition carefully for duplicative time, *see Hensley*, 461 U.S. at 434 [103 S.Ct. at 1939]; *see also Roe v. City of Chicago*, 586 F.Supp. 513, 514 (N.D.Ill.1984).[11]

**8.** Unless the original fee-shifting claim made by the litigant already found to have been the victim of Rule-violative conduct proved to be truly outrageous and overreaching, it is highly unlikely that fees incurred by the offending party in challenging the award (even with partial success) would be shifted back to the originally victimized litigant. Thus such fees are almost invariably a non-shiftable cost of mounting a challenge, to be placed in the opposite balance of the scales in deciding whether to do so.

**9.** This equation (and also the equation suggested in the last sentence of this paragraph 4) of course presume that items (b) and (c) (or item (b) alone in the case of the other equation) would be added expenses to be imposed on the original Rules violator if the objections to the other party's fee-shifting request were rejected

by the court. That presumption is wholly justified.

**10.** In this respect the lawyers who seek fee-shifting can never win in the eyes of the adversary. If one lawyer has done everything, the attack will take the form of arguing that the lawyer was overqualified for some of the work (research by a high-fee-billing partner is one obvious example) and therefore should not be allowed to charge at his or her full hourly rate for those services. But if any delegation of work has taken place, the attacker will urge that conference time among the lawyers is duplicative and therefore nonchargeable.

**11.** [Footnote by this Court] *Roe* was an opinion by this Court, voicing precisely the opposite side of the argument from that suggested for consid-

This Court, as one administering Rule 37(a)(4) in the trenches, is not a policymaker authorized to reshape the law. Accordingly the discussion preceding the *Jardien* reference is intended only for possible consideration by those having that policymaking function—that is, it is dictum in the classic sense—and this opinion therefore turns to the determination of reasonableness that has informed the case law (most recently *Jardien*) to this point.

Toward that end this Court has exercised its best efforts—inherently an imperfect task in reviewing lawyers' work from the outside and in retrospect—to determine a reasonable fee under all the circumstances. In *Jardien* terms, it has "parse[d] the fees petition for excessive or duplicative time." Although as already stated the Seldon affidavit and supporting materials have much to commend them as a thoughtful approach to the issues, and although Koval's counsel are not really entitled by rights to a great deal of relief from their self-inflicted wound, this Court's item-by-item review has led it to these conclusions among others:

1. Seldon's voluntary reduction of Krooth & Altman's original request by eliminating the time of more than two lawyers from any component of the request does not go far enough. There was too much *double* lawyering in situations where one would have been sufficient. That needlessly pyramids the time spent in keeping everyone up to speed, in cross-conferencing and in revisions of other lawyers' work. Because the in-volvement of a second Krooth & Altman lawyer should properly have been limited to minimizing the performance of services by someone overqualified by the job, and because such involvement need not have been such as to keep both lawyers in a fully fungible position on all aspects of the dispute, this Court has eliminated virtually all of the discussion and conference time from the Petition.

2. Relatedly, the totals of 57 hours for the motion to compel and 21 hours for the reply brief (Seldon Aff. ¶ 19) are just too high. Although any degree of precision in the reconstructive process is impossible (see numbered paragraph 5 of the earlier discussion in this opinion), substantial blocks of time have been carved out in an effort to cut the request down to size.

3. Although the extensive involvement of local Chicago counsel Bruce Meckler in the proceedings was directly traceable to the inexplicable refusal of Koval's counsel to permit Seldon to play his proper role in the matter, Meckler's total time is so heavy in relation to the time ultimately approved by this Court for the Krooth & Altman people that a perhaps arbitrary reduction of one-third in the Meckler time for fee-shifting purposes appears in order.

In summary, after the required parsing of the entries in the Petition, the total approved time and expenses work out this way:

---

eration in the just-completed discussion in this opinion. But such presentation of both sides of the issue by the same source need not seek the shelter of self-justification in terms of Emerson's famous aphorism about "foolish consistency":

1. For one thing, a meaningful distinction can be advanced between (a) Rule 37(a)(4) fee-shifting (which is a byproduct of a discrete dispute within a case, where the lawyers' services are normally rendered without contemplation of the costs being thrust on the adversary later) and (b) the imposition of fees on the losing party as a matter of course, as in 42 U.S.C. § 1983 or ADEA litigation (where it is known even before the services are rendered that the adversary will foot the bill if the lawsuit is successful). That distinction could well make a difference in the lawyer's ap-proach to the services (even in subliminal terms) and therefore in the likelihood that the free market approach would produce an objectively reasonable result.

2. That may also be said of the sharp distinction in size between the normal Rule 37(a)(4) fee request and the total-case fee award such as that in *Jardien*. Ordinarily (though not always) the possibility of overstaffing or other inflationary factors is much smaller in discovery disputes than in total case management.

3. Even apart from such distinctions—that is, if one looks at fee-shifting in the generic sense—it is still worthwhile for this Court to present both perspectives to facilitate analysis of the issues in depth, rather than simply following a rule without examining its underlying premises.

| Seldon | 24.8 hrs. × $225 | $ 5,580.00 |
|---|---|---|
| Greszes | 5.7 hrs. × $125 | 712.50 |
| Kijewski | 32.2 hrs. × $125 | 4,025.00 |
| Law clerks | 6.5 hrs. × $ 50 | 325.00 |
| Meckler | 24.6 hrs. × $125 | 3,075.00 |
| | | $13,717.50 |
| Expenses | | 394.48[12] |
| | Total | $14,111.98 |

Koval's counsel are ordered to pay the sum of $14,111.98 to PaineWebber on or before November 27, 1989.

B.H., C.H., J.E. and C.Z., E.G., O.G., S.G., C.G., P.G. and A.G., by their next friend Joseph MONAHAN, individually and on behalf of all others similarly situated, Plaintiffs,

v.

12. This is the total requested in Seldon Aff. Atts. J and K less the erroneously included travel expense of $264.80 (as confirmed by Meckler's June 9, 1989 letter).